# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Appellant,

v.

LEON WILLIAM TACARDON,
Defendant and Respondent.

S264219

Third Appellate District
C087681

San Joaquin County Superior Court
STK-CR-FER-2018-0003729

December 29, 2022

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Kruger, Jenkins, and Guerrero concurred.

Justice Groban filed a concurring and dissenting opinion.

Justice Liu filed a dissenting opinion.

# PEOPLE v. TACARDON

## S264219

Opinion of the Court by Corrigan, J.

A sheriff's deputy patrolling after dark saw three people sitting in a legally parked car in a residential neighborhood, smoking something. He pulled up behind the car, illuminated it with a spotlight, and approached on foot. We granted review to examine the significance of the deputy's use of a spotlight in this circumstance. We conclude that shining a spotlight for illumination does not ipso facto constitute a detention under the Fourth Amendment. Rather, the proper inquiry requires consideration of the totality of the circumstances, including the use of a spotlight.

## I. BACKGROUND

Sheriff's Deputy Joel Grubb testified to the following facts at the preliminary hearing, where defendant Leon William Tacardon first moved to suppress evidence.

On a March evening, around 8:45 p.m., in a residential Stockton neighborhood, Grubb was on patrol in a marked car. The area was known for narcotics sales and weapons possession. While patrolling, Grubb had both his headlights and high beams on for "extra visibility." He drove past a BMW legally parked in front of a residence, in the vicinity of a streetlight. The car's engine and headlights were off; smoke emanated from slightly open windows. He saw three people inside and made eye contact with the occupants as he drove past them. Grubb made a U-turn, parked about 15 to 20 feet behind the BMW, and turned

on his spotlight. He did not activate his siren or emergency lights or issue any commands to the car's occupants. He sat in his patrol car for 15 to 20 seconds while he informed dispatch of his location. He then approached the BMW at a walking pace. He did not draw a weapon.

As the deputy approached, a woman sitting in the backseat "jumped out" of the BMW, closing the door behind her. The deputy testified that "[i]t was very quick and kind of abrupt the way that she opened the door and quickly stepped out. I felt it was unusual." She walked towards the back of the BMW, and Grubb asked her what she was doing. She responded, "I live here." Concerned for his safety, the deputy directed the woman to stand near the sidewalk behind the BMW where he could see her. He spoke in a calm and moderate voice and did not draw a weapon. The woman complied.

Grubb continued to walk toward the car. As he came within a few feet of the BMW, he smelled marijuana smoke coming from inside. The car's rear windows were tinted. Even with the spotlight on, Grubb had to use a flashlight to illuminate the car's interior. He could see one large and two smaller clear plastic bags on the rear passenger floorboard. They contained a green leafy substance.

Tacardon sat in the driver's seat. Upon request, both he and the front seat passenger identified themselves. Only the passenger produced identification. After Grubb saw a partially burned, hand-rolled cigarette in the center console, he asked Tacardon about that item and the leafy substance in the bags. Asked whether he was on probation or parole, Tacardon said he was on probation. The discussion lasted two to three minutes.

Telling Tacardon to remain seated, Grubb returned to his patrol car. A records search confirmed that Tacardon was on probation with a search condition. After additional officers arrived, the deputy placed Tacardon in the back of the patrol car and searched the BMW. He seized the three plastic bags in the backseat and a vial containing 76 pills. A search incident to arrest revealed that Tacardon carried $1,904 in cash. Laboratory analysis confirmed that the bags contained 696 grams of marijuana, and the pills were hydrocodone. The amount of drugs, their presence in a car, and the accompanying cash were factors consistent with possession for sale.

Tacardon was charged with possession for sale of hydrocodone and marijuana. (Health & Saf. Code, §§ 11351, 11359, subd. (b).) At the preliminary hearing, the magistrate denied Tacardon's motion to suppress the evidence (Pen. Code, § 1538.5) and held him to answer. The magistrate reasoned: "it was a police contact . . . . [I]n other words, he didn't stop the defendant. There certainly was a point at which the defendant wasn't free to go but that still would not preclude it being characterized as a contact." The deputy's observation of a large quantity of what appeared to be marijuana in plain view in the back of the car justified further investigation.

Tacardon renewed his motion to suppress in conjunction with a motion to dismiss the information. (Pen. Code, §§ 995, subd. (a)(2)(B), 1538.5, subds. (i), (m); *People v. Lilienthal* (1978) 22 Cal.3d 891, 896–897; *People v. McDonald* (2006) 137 Cal.App.4th 521, 528–529.) Based on the preliminary hearing record, the superior court granted the motion and dismissed the charges. The court held that Deputy Grubb engaged in a consensual encounter when he initially pulled behind

Tacardon's car and turned on his spotlight. But his detention of the female passenger effectuated a detention of Tacardon.

The Court of Appeal reversed. It agreed with the superior court that Grubb's position behind Tacardon's car, spotlight illumination, and approach on foot did not "manifest a sufficient show of police authority to constitute a detention." (*People v. Tacardon* (2020) 53 Cal.App.5th 89, 99 (*Tacardon*).) The court noted that the deputy did not block defendant's car, use his emergency lights, or immediately and aggressively question Tacardon. (*Id.* at pp. 98–99.) It concluded: "Simply put, although a person whose vehicle is illuminated by police spotlights at night may well feel he or she is 'the object of official scrutiny, such directed scrutiny does not amount to a detention.' " (*Id.* at pp. 99–100, quoting *People v. Perez* (1989) 211 Cal.App.3d 1492, 1496 (*Perez*).) However, it rejected the superior court's conclusion that Grubb's interaction with the female passenger transformed the encounter with Tacardon into a detention. It reasoned that there was "no evidence [Tacardon] observed the deputy's interaction with [the passenger], or that the deputy conveyed to defendant that he, like [his passenger], was required to remain." (*Tacardon*, at p. 100.)

In analyzing the deputy's initial approach, the Court of Appeal expressly disagreed with *People v. Kidd* (2019) 36 Cal.App.5th 12 (*Kidd*), which found an unlawful detention on similar facts. In *Kidd*, a patrolling officer saw two men parked on a residential street with the car's fog lights on at 1:30 in the morning. (*Id.* at p. 15.) He drove past the car, made a U-turn, and parked 10 feet behind the vehicle. The officer shined two spotlights on the parked car and approached on foot. (*Id.* at p. 16.) The appellate court found that Kidd, who was in the driver's seat, was detained when the officer pulled up behind the

4

parked car and turned on the patrol car's spotlights. (*Id.* at pp. 21–22.) The court observed: "motorists are trained to yield immediately when a law enforcement vehicle pulls in behind them and turns on its lights. Regardless of the color of the lights the officer turned on, a reasonable person in Kidd's circumstances 'would expect that if he drove off, the officer would respond by following with red light on and siren sounding . . . .' " (*Id.* at p. 21, quoting *People v. Bailey* (1985) 176 Cal.App.3d 402, 406 (*Bailey*).) The court further observed that "any ambiguity was removed when the officer more or less immediately exited his patrol vehicle and began to approach Kidd's car. Although the officer's approach was, according to record, not made in a particularly aggressive or intimidating manner, a reasonable person in Kidd's circumstances would not have felt free to leave." (*Kidd*, at pp. 21–22.)

We granted review to resolve this conflict in the Courts of Appeal.

## II. DISCUSSION

The outcome here turns on the distinction between a consensual encounter and a detention. Deputy Grubb did not stop the car. It was already parked on the street when he saw it. Officers can approach people on the street and engage them in consensual conversation. (*People v. Brown* (2015) 61 Cal.4th 968, 974 (*Brown*).) So merely walking up to someone in a parked car is not a detention. The issue presented is whether there are additional circumstances, the totality of which transformed the encounter into a detention.

"An officer may approach a person in a public place and ask if the person is willing to answer questions. If the person voluntarily answers, those responses, and the officer's

observations, are admissible in a criminal prosecution. [Citations.] Such consensual encounters present no constitutional concerns and do not require justification. [Citation.] However, 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen,' the officer effects a seizure of that person, which must be justified under the Fourth Amendment to the United States Constitution. [Citations.] In situations involving a show of authority, a person is seized 'if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," ' or ' "otherwise terminate the encounter" ' [citation], and if the person actually submits to the show of authority." (*Brown*, *supra*, 61 Cal.4th at p. 974.)

We consider the totality of the circumstances in determining whether a detention occurred. (*Florida v. Bostick* (1991) 501 U.S. 429, 437 (*Bostick*); *Michigan v. Chesternut* (1988) 486 U.S. 567, 572 (*Chesternut*); *Brown, supra*, 61 Cal.4th at p. 980.) Relevant circumstances may include: the presence of multiple officers, an officer's display of a weapon, the use of siren or overhead emergency lights, physically touching the person, the use of a patrol car to block movement, or the use of language or of a tone of voice indicating that compliance with the officer's request is compelled. (*Chesternut*, at p. 575; *In re Manuel G.* (1997) 16 Cal.4th 805, 821.) The facts are reviewed objectively. As *People v. Franklin* (1987) 192 Cal.App.3d 935 (*Franklin*) explained, "The officer's state of mind is not relevant . . . except insofar as his overt actions would communicate that state of mind." (*Id.* at p. 940.) Likewise, "the individual citizen's subjective belief [is] irrelevant . . . ." (*Manuel G.*, at p. 821.)

Where, as here, a suppression motion is made before a magistrate in conjunction with a preliminary hearing and no new evidence is presented in superior court, we are "concerned solely with the findings of the [magistrate]." (*People v. Gentry* (1992) 7 Cal.App.4th 1255, 1262.) We defer to the magistrate's express and implied findings of fact if supported by substantial evidence. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301; *People v. Romeo* (2015) 240 Cal.App.4th 931, 941–942; *People v. Hua* (2008) 158 Cal.App.4th 1027, 1033; *Gentry*, at p. 1262.) We independently assess whether the challenged search or seizure violates the Fourth Amendment, applying federal constitutional standards. (*Brown*, *supra*, 61 Cal.4th at p. 975; *People v. Lenart* (2004) 32 Cal.4th 1107, 1118; see Cal. Const., art. I, § 28, subd. (f)(2).)

It is clear that Tacardon was detained at some point. The question is when. The timing is critical to the outcome. The parties agree that Deputy Grubb had no reasonable suspicion of criminal activity before he smelled marijuana smoke and saw what appeared to be bags of marijuana in the backseat. So if Tacardon was detained before that point, the action was unjustified and evidence subsequently discovered during the deputy's search was subject to suppression. (*Terry v. Ohio* (1968) 392 U.S. 1, 12, 15, 21–22.)

### A. *Pulling Behind, Activating Spotlight, and Approaching the Parked Car*

In *Brown*, *supra*, 61 Cal.4th 968, the circumstances were these. At 10:37 p.m., a 911 caller reported that more than four people were fighting in an alley behind his house, and someone said they had a loaded gun. The dispatcher sent out this information and Deputy Geasland responded, using lights and siren. (*Id*. at pp. 972–973.) As he drove down the alley,

7

Geasland saw a car driving toward him and away from the reported location. Geasland yelled to the driver, " 'Hey. Did you see a fight?' " (*Id.* at p. 973.) Brown drove on without responding. Seeing no one else in the alley, Geasland drove after Brown. When he saw Brown's car parked nearby, he stopped behind it and activated the patrol car's colored emergency lights. He approached and spoke to Brown, whom he arrested for driving under the influence. (*Ibid.*) We concluded that Brown was detained when the deputy stopped behind his parked car and turned on the patrol car's overhead emergency lights. Observing that "[t]he Supreme Court has long recognized that activating sirens or flashing lights can amount to a show of authority" (*id.* at p. 978), we concluded that, under the circumstances presented, "a reasonable person in Brown's position would have perceived Geasland's actions as a show of authority, directed at him and requiring that he submit by remaining where he was. As a sister-state court has observed: 'We see little difference, from the perspective of the occupants in the vehicle, [between] turning on the blue lights behind a moving vehicle and turning on the blue lights behind a parked vehicle. The lights still convey the message that the occupants are not free to leave.' " (*Ibid.*, quoting *State v. Gonzalez* (Tenn.Crim.App. 2000) 52 S.W.3d 90, 97.)

*Brown* did not, however, adopt a bright line rule that "an officer's use of emergency lights in close proximity to a parked car will always constitute a detention of the occupants." (*Brown, supra,* 61 Cal.4th at p. 980.) Instead, we emphasized such an inquiry " 'must take into account " 'all of the circumstances surrounding the incident' " in each individual case.' " (*Ibid.*) We gave the following example: "a motorist whose car had broken down on the highway might reasonably perceive an officer's use

of emergency lights as signaling that the officer has stopped to render aid or to warn oncoming traffic of a hazard, rather than to investigate crime. Ambiguous circumstances may be clarified by whether other cars are nearby or by the officer's conduct when approaching." (*Ibid.*) We observed, on the facts before us, that "no circumstances would have conveyed to a reasonable person that Deputy Geasland was doing anything other than effecting a detention. Under the totality of these circumstances, Brown was detained when Geasland stopped behind the parked car and turned on his emergency lights." (*Ibid.*)

This case involves the use of a spotlight, rather than red and blue emergency lights. Accordingly, we consider how the use of a spotlight affects the analysis of whether a detention took place.

Several Courts of Appeal have found the distinction between a spotlight and red and blue emergency lights significant. In *Perez, supra,* 211 Cal.App.3d 1492, an officer pulled up facing the defendant's parked car, leaving room for the defendant to drive away, and activated the patrol car's high beams and spotlights. The officer walked up to the car, knocked on the window, identified himself, shined a flashlight into the car, and asked the defendant to roll the window down. The officer immediately smelled marijuana. (*Id.* at pp. 1494–1495.) The Court of Appeal found no detention, noting that the officer had not blocked the defendant's car or activated the patrol car's emergency lights. It further reasoned that, "[w]hile the use of high beams and spotlights might cause a reasonable person to feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention." (*Id.* at p. 1496.)

In *People v. Rico* (1979) 97 Cal.App.3d 124, an officer investigating a recent shooting saw a car driving on the freeway that matched the description of a suspect vehicle. The officer pulled alongside the car and shined a spotlight on it. He then dropped back and followed the car for approximately five minutes without activating his emergency lights. The driver eventually pulled over on his own, and the officer stopped several car lengths behind, again turned on his spotlight, and engaged the car's occupants. He ultimately recovered a rifle, the butt of which he saw sticking out from under the driver's seat. (*Id*. at pp. 128–129.) The appellate court concluded that the officer's initial "momentary use of the spotlight" to observe the suspect vehicle's occupants as he was driving next to them was not a detention "in the absence of flashing lights, sirens or a directive over the loudspeaker." (*Id*. at p. 130.) Indeed, the officer "immediately pulled back without any show of authority." (*Ibid*.)

In *Franklin, supra,* 192 Cal.App.3d 935, an officer saw the defendant walking in a high crime area wearing a full-length camouflage jacket on a warm summer evening. Finding this odd, the officer shined a spotlight on the defendant and parked the patrol car directly behind him. The defendant approached the officer and asked, " 'What's going on?' " (*Id*. at p. 938.) He was sweaty and " 'jittery.' " (*Ibid*.) When the officer asked the defendant to remove his hands from his pockets, he saw what appeared to be blood on the defendant's hands and a vial in his pocket containing white powder. The defendant fled and was detained. (*Ibid*.) The Court of Appeal concluded that shining a spotlight on the defendant and parking behind him was not a detention: "the officer did not block [the defendant's] way; he directed no verbal requests or commands to [the defendant].

Further, the officer did not alight immediately from his car and pursue [the defendant]. Coupling the spotlight with the officer's parking the patrol car, [the defendant] rightly might feel himself the object of official scrutiny. However, such directed scrutiny does not amount to a detention." (*Id.* at p. 940.)

A survey of federal and sister-state authorities yields similar results. (*U.S. v. Campbell-Martin* (8th Cir. 2021) 17 F.4th 807, 811–812, 814 [no detention where officer parked two spots away from the defendant's car, shined a spotlight on it, and approached on foot]; *U.S. v. Tafuna* (10th Cir. 2021) 5 F.4th 1197, 1199, 1201–1202 [no detention where officer parked with his patrol car at an angle to the defendant's driver's side door, activated a bar of "takedown" lights, and approached the defendant's car]; see also *id.* at p. 1201 [citing cases from the 1st, 7th, 8th, and 9th Cir.]; *U.S. v. Tanguay* (1st Cir. 2019) 918 F.3d 1, 2–3, 7–8 (*Tanguay*) [no detention where officer parked about 10 feet behind the defendant's car, activated his floodlights, and approached on foot]; *People v. Cascio* (Colo. 1997) 932 P.2d 1381, 1382–1383, 1386–1388 (*Cascio*) [no detention where two deputies parked about 10 feet behind defendant's van, trained a spotlight on it, and approached on foot].) Applying the totality of the circumstances test to the record before them, these courts held there had been no detention despite the use of a spotlight. (But see *U.S. v. Delaney* (D.C. Cir. 2020) 955 F.3d 1077, 1079–1080, 1082–1083 [detention occurred where officers parked within a few feet of the nose of the defendant's car in a narrow parking lot, significantly restricting the defendant's movement, and activated their "take-down light"].)

As noted, *Kidd, supra,* 36 Cal.App.5th 12 came to a contrary conclusion based on facts similar to those presented here. In that case a patrolling officer saw two men parked on a

residential street with the car's fog lights on at 1:30 in the morning. The officer decided to check and see if the occupants were stranded, " 'or what exactly they[ were] doing.' " (*Id.* at p. 15.) He drove past the car, made a U-turn and parked 10 feet behind the vehicle, shining two spotlights on it. As he approached the car, he smelled marijuana smoke and asked the men what they were doing. Kidd was in the driver's seat. The passenger was seen attempting to hide bags of suspected marijuana. The officer asked if either man was on probation or parole. When Kidd admitted he was on probation, the officer told both men to leave the car and sit in the patrol vehicle. A subsequent probation search revealed packaged marijuana, a digital scale, a pistol with a serial number removed, and 142 alprazolam pills. (*Id.* at pp. 15−16.)

The *Kidd* court held the defendant was detained without reasonable suspicion "as soon as the officer pulled in behind him and turned his spotlights on him." (*Kidd, supra,* 36 Cal.App.5th at p. 22.) *Kidd* began by acknowledging the authority of *Rico* and *Franklin* that, without more, the mere act of parking behind someone "would not reasonably be construed as a detention," nor would shining a spotlight on a person. (*Id.* at p. 21.) It also acknowledged that the officer did not block the car, activate emergency lights, or approach in an aggressive or intimidating manner. (*Id.* at pp. 21–22.) The court nonetheless concluded that the defendant was detained under the totality of the circumstances. (*Id.* at p. 21.) Quoting *People v. Garry* (2007) 156 Cal.App.4th 1100, 1111−1112 (*Garry*) (see discussion, *post,* at pp. 21–22), it concluded the "officer's 'show of authority' was so intimidating as to communicate to any reasonable person that he or she was ' " 'not free to decline [his] requests or otherwise terminate the encounter.' " ' " (*Kidd,* at p. 21.) As for

the significance of the spotlights, the court reasoned: "motorists are trained to yield immediately when a law enforcement vehicle pulls in behind them and turns on its lights. Regardless of the color of the lights the officer turned on, a reasonable person in [the defendant's] circumstances 'would expect that if he drove off, the officer would respond by following with red light on and siren sounding.'" (*Kidd*, at p. 21, quoting *Bailey*, *supra*, 176 Cal.App.3d at p. 406.)

The *Kidd* court's discussion of the spotlight differs from the other appellate court decisions. By concluding that a reasonable person would not feel free to leave when an officer pulls in behind the person's parked car and turns on the patrol car's lights, "[r]egardless of the color of the lights the officer turned on" (*Kidd*, *supra*, 36 Cal.App.5th at p. 21), the court described the use of a spotlight in this circumstance as essentially indistinguishable from the activation of red and blue emergency lights. We disagree. As other courts have held, the use of a spotlight generally conveys a different meaning to a reasonable person than the use of a patrol car's emergency lights. Red and blue lights are almost exclusively reserved for emergency and police vehicles. (See Veh. Code, §§ 21055, subd. (b), 25258, subd. (b)(1), 25269.) An officer's use of flashing red lights, or combination of red and blue lights, behind a vehicle typically conveys a command to stop. (*Brown*, *supra*, 61 Cal.4th at p. 978; but see *id*. at p. 980.) Indeed, a motorist may not be convicted of evading police unless a red light is displayed. (Veh. Code, § 2800.1, subd. (a)(1); *People v. Hudson* (2006) 38 Cal.4th 1002, 1008.)

By contrast, a reasonable person would understand that spotlights can have a practical function that differs from the essentially communicative function of emergency lights. A

spotlight can be used to illuminate the surrounding area for safety or other purposes unrelated to the projection of authority. Proper illumination enhances the officer's ability to make " 'swift, on-the-spot decisions' " that are appropriate to the circumstances. (*Brown, supra*, 61 Cal.4th at p. 984, quoting *United States v. Sokolow* (1989) 490 U.S. 1, 11.)[1] And, in certain circumstances, depending on how the spotlight is used, it might help both the officer and the civilian see what the other is doing and make decisions accordingly. Thus, unlike *Kidd*, we believe a reasonable person would distinguish between a spotlight and

---

[1] The dissent asserts that the police do not have the same latitude to conduct an investigation at night as they do during the day. (Dis. opn. of Liu, J., *post*, at pp. 10–11.) The authorities cited are inapposite. Penal Code sections 840 and 1533 limit the ability to arrest or execute a search warrant at night out of concern for the sanctity of the home. The cited sections do not impose general restrictions on an officer's authority or responsibility to investigate crimes at night. Further, they do not at all restrict police investigations in public places. Instead, Penal Code section 840 prohibits an *arrest* for the commission of a misdemeanor or infraction between 10:00 p.m. and 6:00 a.m. and specifically excepts arrests "made in a public place." (*Id.*, subd. (2).) Penal Code section 1533 requires that a *search warrant* be served only between 7:00 a.m. and 10:00 p.m. absent a finding of good cause. (See also *People v. Watson* (1977) 75 Cal.App.3d 592, 595–596 [Pen. Code, § 1533 is concerned with the drastic intrusion upon a person's residence by execution of a search warrant].)

The nonbinding authority of *U.S. v. Wilson* (4th Cir. 2000) 205 F.3d 720, 723–724 and *U.S. v. McLemore* (8th Cir. 2018) 887 F.3d 861, 866–867 hold that an officer's inability to see does not justify a *suspicionless detention*. They do not address whether an officer can investigate darkened areas or whether the use of illumination effects a detention.

red and blue emergency lights in considering whether the person was free to leave or otherwise terminate the encounter.

As in *Brown*, however, we decline to state a bright-line rule. A court must consider the use of a spotlight together with all of the other circumstances. It is certainly possible that the facts of a particular case may show a spotlight was used in an authoritative manner. These may include flashing lights at the driver to pull the car over or attempting to blind the driver, which would be relevant considerations under the totality of the circumstances. (See, e.g., *Cascio*, *supra*, 932 P.2d at p. 1388.) But use of a spotlight, standing alone, does not necessarily effect a detention.

Considering the circumstances here, Tacardon was not detained when Deputy Grubb parked behind the BMW, shined a spotlight on it, and began to approach on foot. Grubb made eye contact with Tacardon as he drove by. He then made a U-turn, parked 15 to 20 feet behind Tacardon's car, and employed the spotlight. After taking about 20 seconds to inform the dispatcher, he began walking towards the car. The deputy's conduct up to this point conveyed none of the coercive hallmarks of a detention. He did not stop Tacardon's vehicle or block him from driving away. He did not activate a siren or emergency lights or give directions by loudspeaker. He did not approach rapidly or aggressively on foot or draw a weapon. He gave no commands and made no demands; in fact, he did not seem to communicate at all with Tacardon or his passengers until the woman got out of the car and began to walk away. As we explain below (see discussion, *post,* at p. 26), it was only after she was given, and complied with, Grubb's directive to remain that she was detained.

Until that point, the deputy's conduct was consistent with that in *United States v. Drayton* (2002) 536 U.S. 194 (*Drayton*). There, the high court found no detention where there was "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." (*Id.* at p. 204.) In this context, a reasonable person would view the deputy's use of a spotlight as similarly lacking in coercive force. The deputy used the spotlight as a matter of course. There was no evidence it was unusually bright or flashing, or that Tacardon was blinded or overwhelmed by the light. Certainly, a reasonable person would notice the deputy's use of a spotlight, and depending on how it is used, a spotlight may contribute to the coerciveness of a police encounter. But under the totality of the circumstances here, Tacardon was not detained.

The dissent argues that this conclusion "strains credulity." (Dis. opn. of Liu, J., *post*, at p. 4.) Citing a magazine article and a manual by a patrol officer, the dissent asserts that it is a matter of common experience for both officers and civilians alike that a spotlight has a disorienting effect on a car's occupants. (*Id.* at p. 6.) It also relies on cases which noted some evidence of that effect. (*Id.* at p. 7.) But no such evidence was elicited here. The deputy was not asked whether he had been trained to use his spotlight in that fashion, or whether its use in this circumstance was disorienting. Tacardon did not testify that he

was blinded by the spotlight.  For this reason, the nonbinding cases cited by the dissent are distinguishable.[2]

---

[2]      In *U.S. v. Delaney, supra,* 955 F.3d 1077, the officers parked their patrol car approximately " '[three] feet away from the nose of the [defendant's] Jeep' " and trained their patrol car's "take-down light" on it.  (*Id.* at pp. 1082, 1083.)  The court noted that "[s]uch aptly named lights 'are designed to illuminate the stopped car as well as to provide protection for an officer by blinding and disorienting the car's occupants if they look back at the squad car.' " (*Id.* at p. 1083, quoting *U.S. v. Shelby* (7th Cir. 2000, Oct. 26, 2000, No. 00-1873) 2000 WL 1611120, p. *1, fn. 1 [unpublished table decision].)  Notably, the unpublished case *Delaney* quoted for the description of the "take-down light" provides no source material for this factual assertion; nor did it involve a Fourth Amendment challenge to the defendant's detention in that case.  (See *Shelby, supra,* 2000 WL 1611120, at pp. *1, fn. 1, *2.)

In *U.S. v. Sigmond-Ballesteros* (9th Cir. 2002) 285 F.3d 1117, the officer in that case, having "pulled alongside Defendant's truck" as it traveled in the slow lane of a highway, "shined his alley light almost directly into Defendant's face" while the defendant was still driving.  (*Id.* at pp. 1120, 1124.)  The defendant put his hand up to shield his eyes from the light.  (*Id.* at p. 1120.)  The officer described the defendant's act of covering his face as " 'suspicious behavior,' " but the court disagreed and concluded that this gesture did not supply reasonable suspicion to detain.  (*Id.* at p. 1124.)  It did not consider whether use of such illumination effected a detention.  (*Ibid.*)

In *State v. Garcia-Cantu* (Tex.Crim.App. 2008) 253 S.W.3d 236, the officer trained a spotlight on the defendant's truck "even before he stopped his [patrol] car" (*id.* at p. 245), blocked the defendant's truck (*id.* at p. 246), approached the car in an authoritative manner (*id.* at p. 248), asked, " 'What are you doing here?' " (*ibid.*), shined a flashlight into the defendant's eyes, and requested identification (*ibid.*).    The defendant testified at the suppression hearing that when the officer pulled

Citing a treatise, the dissent reasons that "[s]ingling out a parked car and training a powerful spotlight on it from behind, as [Deputy] Grubb did here, is 'conduct significantly beyond' any sort of 'nonoffensive contact . . . between two ordinary citizens.' " (Dis. opn. of Liu, J., *post*, at p. 9, quoting 4 LaFave, Search and Seizure (6th ed. 2002) § 9.4(a), pp. 597, 598, fns. omitted.) But LaFave, and the extra-jurisdictional cases cited, do not support the conclusion that the circumstances of this case qualified as such a "significant[]" departure from ordinary expectations as to effect a detention. (*Id*. at p. 597.) Addressing specifically the subject of police contact with persons seated in parked vehicles, LaFave acknowledges that no seizure occurs when an officer "merely walks up [and poses a question] to a person . . . who is seated in a vehicle located in a public place." (*Id*. at pp. 591–592, fn. omitted; see also *id*. at p. 610.) Significantly, its list of supporting citations includes *Tanguay*, *supra*, 918 F.3d 1, which held that the officers' act of parking behind a car, activating floodlights, and approaching on foot did not constitute a detention (LaFave, at p. 598, fn. 81, citing *Tanguay*, at p. 7), and *U.S. v. Mabery* (8th Cir. 2012) 686 F.3d 591, which held that the officer's act of shining a spotlight on Mabery's vehicle from the street did not constitute a seizure. (LaFave, at p. 592, fn. 62; see *Mabery*, at pp. 595–597.) None of the circumstances LaFave cites as likely to elevate the encounter to a seizure are present in this case: an order to " 'freeze' " or get out of the car, "boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the

---

up behind him, he "couldn't see anything more except a big spotlight, 'a big white light.' " (*Id*. at p. 240.) The court found a detention based on the totality of the circumstances. (*Id*. at p. 249.)

steering wheel, or use of *flashing lights* as a show of authority." (LaFave, at pp. 611, 612–613, italics added, fns. omitted; see also *id.* at pp. 613–614, fn. 130 [citing, among other authorities, *Brown, supra*, 61 Cal.4th 968 and contrasting cases where only use of spotlight was involved].)

Tacardon reasons that he was clearly the focus of the deputy's "official scrutiny" when the deputy made eye contact, turned the patrol car around, parked behind the BMW, activated his spotlight, and began walking towards the car. According to Tacardon, he "knew he was engaged in an encounter with the authorities even before the deputy approached the car on foot, and was well aware of the light glaring immediately behind his car." He cites *Kidd*'s holding that "any ambiguity [as to whether a detention occurred] was removed when the officer more or less immediately exited his patrol vehicle and began to approach [the defendant's] car. Although the officer's approach was, according to record, not made in a particularly aggressive or intimidating manner, a reasonable person in [the defendant's] circumstances would not have felt free to leave." (*Kidd, supra,* 36 Cal.App.5th at pp. 21–22.)

Under Tacardon's proposed rule, any person who is aware of police scrutiny and is then illuminated by a spotlight is necessarily detained. Such a rigid approach fails to properly honor the totality of the circumstances test noted in *Brown*. A person approached by an officer may well consider himself the object of official scrutiny. Indeed he is. An officer of the law has initiated a contact for some reason and is requesting interaction. The question is where Fourth Amendment jurisprudence draws the line between mere consensual contact, which requires no justification, and a detention, which requires articulation of a

19

reasonable suspicion that a crime may be afoot. But the high court has long held an officer's mere approach does not constitute a seizure. (*Bostick, supra,* 501 U.S. at p. 434; *Chesternut, supra,* 486 U.S. at pp. 575–576; *INS v. Delgado* (1984) 466 U.S. 210, 216 (*Delgado*); *Florida v. Royer* (1983) 460 U.S. 491, 497 (plur. opn. of White, J.).) While a reasonable person in Tacardon's position might "feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention." (*Perez, supra,* 211 Cal.App.3d at p. 1496; accord, *People v. Chamagua* (2019) 33 Cal.App.5th 925, 927, 929; *Franklin, supra,* 192 Cal.App.3d 935, 940.) A detention occurs, not the moment a person knows an officer would like to interact, but when a person would reasonably believe he or she " ' "was not free to leave" ' or ' "otherwise terminate the encounter," ' " and submits to the officer's show of authority. (*Brown, supra,* 61 Cal.4th at p. 974.)

Notably, courts ruling a detention occurred have emphasized other coercive aspects of the officer's approach that are not present here. *Wilson v. Superior Court* (1983) 34 Cal.3d 777 is instructive in considering when targeted scrutiny might transform a contact into a detention. There, an undercover narcotics officer approached the defendant as he walked off a plane in the Los Angeles International Airport. The officer identified himself, displayed his badge, and asked if he " 'might have a minute of [the defendant's] time.' " (*Id.* at p. 781.) When the defendant said, " 'Sure,' " the officer advised him that he was " 'conducting a narcotics investigation, and that [he] had received information that [the defendant] would be arriving today from Florida carrying a lot of drugs.' " (*Ibid.,* italics omitted.) We found that a detention occurred and clarified when it took place. "[I]t is evident that Detective Kaiser did not detain

Wilson, for federal constitutional purposes, merely by approaching him, identifying himself as a police officer, and asking if he might have a minute of his time. [H]owever, the officer did not simply ask Wilson if he would permit a search of his luggage. Instead, he advised Wilson that he was conducting a narcotics investigation and that he 'had received information that . . . [Wilson] would be arriving today from Florida carrying a lot of drugs.' " (*Id.* at p. 790, italics omitted.) At that point "the entire complexion of the encounter changed . . . ." (*Id.* at p. 791.) "Common sense suggests to us that in such a situation, an ordinary citizen, confronted by a narcotics agent who has just told him that he has information that the citizen is carrying a lot of drugs, would not feel at liberty simply to walk away from the officer." (*Id.* at p. 790.)

In *Garry*, *supra*, 156 Cal.App.4th 1100, an officer on night vehicle patrol saw the defendant standing near a parked car. He pulled up about 35 feet away, turned the patrol car's spotlight on the defendant, and walked " 'briskly' " toward him. (*Id.* at p. 1104.) When the defendant told the officer, " ' "I live right there" ' " and pointed to a house, the officer replied, " 'Okay, I just want to confirm that,' " and asked the defendant if he was on probation or parole. (*Ibid.*) When the defendant said he was on parole, the officer grabbed him and a struggle ensued. The officer handcuffed the defendant and searched him, discovering narcotics. (*Ibid.*) The appellate court found a detention, emphasizing that the officer had rushed at the defendant, disregarded the defendant's representation that he was merely standing outside of his own home, and voiced an intention " 'to confirm that.' " (*Ibid.*; see *id.* at pp. 1111–1112.) The court reasoned: "any reasonable person who found himself in defendant's circumstances, suddenly illuminated by a police

21

spotlight with a uniformed, armed officer rushing directly at him asking about his legal status, would believe themselves to be 'under compulsion of a direct command by the officer.' " (*Id.* at p. 1112, quoting *People v. McKelvy* (1972) 23 Cal.App.3d 1027, 1034.)

In *People v. Kasrawi* (2021) 65 Cal.App.5th 751, review granted September 1, 2021, S270040, an officer patrolling in a residential neighborhood early one morning saw the defendant cross the street and begin to enter a car. The officer turned on the patrol car's spotlight and "pulled up behind and to the side of" the defendant's vehicle. (*Id.* at p. 754.) The defendant turned to face the officer, who immediately approached and walked to within a few feet of the defendant, asking him where he was coming from. The defendant responded that he was resting while on a drive from Los Angeles, which the officer found suspicious because the street was several miles from the highway. The officer detained and handcuffed the defendant and discovered an outstanding warrant. A search incident to arrest yielded stolen items from nearby cars. (*Id.* at pp. 754–755.) The appellate court concluded that the defendant was detained before he responded to the officer's inquiry. (*Id.* at p. 756.) It emphasized that the officer parked within a few feet of the defendant's car; " 'bathed' " the defendant with light; immediately approached with "speed and surety," as memorialized by the officer's body camera; and asked an immediate, pointed question, which demanded an answer. (*Id.* at pp. 759, 760.)

The facts of *Wilson*, *Garry*, and *Kasrawi* are distinguishable from the events here. Upon initially approaching Tacardon's vehicle, Deputy Grubb did not walk rapidly, pose any questions to Tacardon, or accuse him of

anything. The deputy's nighttime approach, aided by a spotlight for illumination, did not, without more, effect a detention. *People v. Kidd, supra,* 36 Cal.App.5th 12 is disapproved to the extent it is inconsistent with the holding here.

Citing other dissenting opinions and legal commentators, the dissent posits that the " 'free to leave' standard has long been criticized for having 'an air of unreality' and for lacking 'common . . . understanding' of how civilians experience encounters with the police." (Dis. opn. of Liu, J., *post,* at p. 8, quoting *Drayton, supra,* 536 U.S. at pp. 208, 210 (dis. opn. of Souter, J.).) Our dissenting colleague emphasizes that he personally would not feel free to simply drive away from the officer in this circumstance, and suspects others would not either. (Dis. opn. of Liu, J., *post,* at p. 2.) As other courts have noted, however, "[t]he 'free to walk away' test . . . must be read in conjunction with the Court's frequent admonitions that 'a seizure does not occur simply because a police officer approaches an individual and asks a few questions.' [Citations.] What emerges between the two imperatives, therefore, is the directive that police conduct, viewed from the totality of the circumstances, must objectively communicate that the officer is exercising his or her official authority to restrain the individual's liberty of movement before we can find that a seizure occurred." (*U.S. v. Cardoza* (1st Cir. 1997) 129 F.3d 6, 16; see also, e.g., *Delgado, supra,* 466 U.S. at p. 216 ["While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response"].) Applying this standard, the high court has held, for example, that workers were not seized when armed law enforcement agents, displaying badges and positioned near the exits, questioned the workers at their

job site about their citizenship as part of a " 'factory survey[].' " (*Delgado*, at p. 212; see *id*. at pp. 212–213, 215–221.) It likewise determined there was no detention where the defendant, in an airport, agreed to speak to law enforcement after knowing he had attracted the officer's attention, and the officer displayed his badge and asked to talk. (*Florida v. Rodriguez* (1984) 469 U.S. 1, 4–6 (per curiam).)

In *Drayton, supra*, 536 U.S. 194, plain-clothes officers boarded a Greyhound bus at a scheduled stop after securing the driver's permission to conduct a routine drug and weapons interdiction effort. Officer Lang displayed his badge and spoke to each passenger, positioning himself so that he did not block the aisle. (*Id*. at pp. 197–198.) Drayton and his companion Brown were seated together. The officer asked if they were traveling with luggage, and the pair pointed to a bag in the overhead rack. (*Id*. at pp. 198–199.) Lang asked, " 'Do you mind if I check [the bag]?' " and Brown said, " 'Go ahead.' " (*Id*. at p. 199.) The check revealed no contraband. Brown then consented to a pat-down search of his person, which resulted in the discovery of contraband. Brown was arrested. (*Ibid*.) Lang then asked Drayton, " 'Mind if I check you?' " (*Ibid*.) Drayton lifted his hands and a pat-down revealed objects similar to drug packaging. Drayton was likewise arrested. Further investigation revealed both men had bundles of cocaine powder duct-taped between several pairs of their boxer shorts. (*Ibid*.) The court held Drayton had not been detained before the pat-down revealed what appeared to be drug packaging. (*Id*. at pp. 203–206.) It concluded that "ample" evidence pointed to a consensual encounter. (*Id*. at p. 204.)

Here, though Grubb made clear his interest in speaking with Tacardon, he did not objectively communicate that he was

exercising his official authority to restrain him. If the high court believes the standard should be changed or applied in a different way, it may certainly so conclude. Until then, however, it is the standard the court prescribes, and we are bound by the court's application of that standard.

The dissent also questions whether today's result creates an incentive for citizens to drive away from officer encounters, risking escalation and danger for both the officer and the civilian. (Dis. opn. of Liu, J., *post*, at pp. 9–12.) But as the high court has recognized in other contexts, individuals frequently have alternatives for asserting their Fourth Amendment rights, such as refusing to answer the officer's questions or otherwise declining to act in the manner the officer has requested. (*Bostick*, *supra*, 501 U.S. at pp. 435–437.) And while many law-abiding citizens will choose to cooperate with the police "because [they] know that their participation enhances their own safety and the safety of those around them," that fact alone does not negate the consensual nature of their response. (*Drayton*, *supra*, 536 U.S. at p. 205.)

## B. *Detention of the Passenger*

Tacardon argues that Deputy Grubb's detention of the female passenger who got out of the car effectively communicated to Tacardon that he also was not free to leave. The Court of Appeal rejected this assertion. Although the court had "no difficulty concluding [the passenger] was detained" when Grubb "ordered her to remain on the sidewalk near the [car]," it found "no evidence defendant observed the deputy's interaction with [the passenger], or that the deputy conveyed to defendant that he, like [the passenger], was required to remain." (*Tacardon*, *supra*, 53 Cal.App.5th at p. 100.) It therefore

concluded that "the magistrate's implied finding that defendant was not detained at this point is supported by substantial evidence." (*Ibid.*)

It is clear that Grubb detained the female passenger. As the deputy approached Tacardon's car, the passenger "jumped out" of the back seat, closed the door behind her, and walked towards the back of the BMW. When the deputy asked her what she was doing, she responded, "I live here." He then directed her to stand near the sidewalk, and she complied. At this point, the woman was detained.

The question is what effect, if any, did Grubb's conduct have on Tacardon. It is well established that an officer's show of authority towards others can communicate that the defendant is also not free to leave or terminate the encounter. In *Brendlin v. California* (2007) 551 U.S. 249 (*Brendlin*), for example, the Supreme Court held that a passenger riding in a vehicle is detained when an officer pulls a driver over for a traffic violation. The court there emphasized that "an 'unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.' " (*Id.* at p. 254, quoting *Brower v. Inyo County* (1989) 489 U.S. 593, 596.) It explained: when a car containing passengers is pulled over, "any reasonable passenger [will understand] the police officers to be exercising control to the point that no one in the car [is] free to depart without police permission." (*Brendlin*, at p. 257.)

But for this rule to apply, the defendant must be aware of the officer's show of authority directed at another. In *Brendlin,* for example, the officer used " 'flashing lights' " to stop the vehicle in which Brendlin was riding. (*Brendlin, supra*, 551 U.S.

at p. 260.) Likewise, in *Brown, supra*, 61 Cal.4th 968, the deputy "pulled behind [the defendant's] car and activated the overhead emergency lights on his patrol car." (*Id*. at p. 973.) We rejected the People's argument that Brown was not aware of the deputy's presence until the deputy approached the car on foot as unsupported by substantial evidence. "[The deputy] did not testify that Brown was unconscious, probing under the seat, or otherwise distracted. The reasonable inference to be drawn from the record was that Brown was aware of the deputy's overhead emergency lights flashing in the dark immediately behind his car." (*Id*. at p. 980.)

Here, then, the critical factual question was whether Tacardon overheard or otherwise perceived the deputy's interaction with the passenger. But the record shows the magistrate did not consider this question. At the preliminary hearing, the prosecutor argued that the deputy's directives to the passenger were "irrelevant with respect to the defendant. Whether or not he stopped her under the Fourth Amendment to keep her from going into that house is not something I need to argue to the court because she's not here." That argument confuses the issue of the passenger's standing to challenge her own detention with the effect her detention may have had on Tacardon. The magistrate appeared to adopt the prosecutor's position, commenting to defense counsel that "[the deputy] said to the woman she couldn't leave. As said by [the prosecutor], that's not the question. [T]he question is [whether] the defendant [was] told he couldn't leave." This formulation is overly narrow. The question is not whether Tacardon was "told he couldn't leave" but whether the totality of the circumstances reasonably conveyed to Tacardon he was compelled to remain. The magistrate further observed that "there certainly was a

point at which the defendant wasn't free to go, but that still would not preclude it being characterized as a contact." The observation overlooks the principle that a consensual encounter can evolve into a detention, and suggests the magistrate did not resolve the critical question of the point at which a detention occurred. The magistrate never made an express factual finding as to whether Tacardon was aware of Grubb's interaction with the passenger. Its endorsement of the prosecutor's argument indicates it did not make an implied finding either.

Because an individual may be detained as a result of a police officer's directives to another person (*Brendlin, supra,* 551 U.S. at p. 260), the magistrate erred by failing to consider whether the deputy's interaction with Tacardon's passenger, together with all the other relevant circumstances, effected a detention of Tacardon as well. Although we independently determine whether the defendant was detained as a matter of law, we rely on the magistrate's factual findings. We normally imply in favor of the magistrate's order every finding that is supported by the evidence, but this rule "operates only where it can be presumed that the court has performed its function of weighing the evidence. If analysis of the record suggests the contrary, the rule should not be invoked." (*Estate of Larson* (1980) 106 Cal.App.3d 560, 567.) Because the record affirmatively shows the magistrate did not consider whether Tacardon was aware of the deputy's interaction with his passenger, the Court of Appeal was wrong to presume the magistrate considered the issue and resolved it against Tacardon. Instead, the record shows the magistrate made no finding at all on that question. (See *In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 769.)

Under the circumstances here, we cannot resolve this factual question in the first instance. "As the finder of fact in a proceeding to suppress evidence [citation], the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) We cannot displace the magistrate as the trier of fact unless the evidence is susceptible to only one reasonable interpretation. (Cf. *Brown*, *supra*, 61 Cal.4th at p. 980.)

Here, unlike *Brown*, the record supports conflicting inferences on the issue of Tacardon's awareness. Tacardon did not testify at the hearing, so any conclusions to be drawn about his awareness of the interaction between Grubb and the female passenger were necessarily circumstantial. On the one hand, Tacardon made eye contact with the deputy as the deputy drove by in a marked patrol car. That fact could support an inference that Tacardon was also aware of the deputy's conduct in turning around, parking behind Tacardon's car, shining his spotlight, and leaving his patrol car to approach Tacardon on foot. An inference could also be drawn that Tacardon was aware his passenger had left the car. As for Tacardon's awareness of the events transpiring thereafter, Tacardon's car was parked on a residential street at night, the engine was off, there was no evidence the street was busy, and the encounter between the deputy and the passenger occurred about five feet behind the car.

On the other hand, the car doors were closed and the front windows were only "slightly lowered." When the deputy encountered the passenger, he was far enough away from the

car that he could not smell marijuana smoke coming from the windows. He spoke to the passenger in a moderate voice and did not draw a weapon. Tacardon was reclined in the driver's seat and wore a hoodie that covered his head. There was smoke in the car and the car's rear windows were tinted. All of these things may have affected Tacardon's ability to see and hear what was going on behind the car. And the occupants were using marijuana, which may have affected their degree of attention. There is no evidence Tacardon asked why the deputy had detained the passenger or otherwise signaled to the deputy that he was aware of that circumstance.

On this record, we cannot say there is only one reasonable inference to be drawn from the facts. Accordingly, we find it appropriate to remand the matter for a new factual finding as to whether Tacardon was aware of the woman's detention and to assess whether Tacardon was detained under the totality of the circumstances. (See *People v. Jenkins* (2004) 119 Cal.App.4th 368, 374; see also *Bostick, supra*, 501 U.S. at p. 437.)[3]

---

[3] Having concluded that Tacardon's detention was supported by reasonable suspicion, the Court of Appeal found it unnecessary to address the Attorney General's other argument that discovery of Tacardon's probation search condition was an intervening circumstance that removed the taint of an otherwise illegal detention. (*Tacardon, supra*, 53 Cal.App.5th at p. 97, fn. 5.) A similar issue is pending before us in *People v. McWilliams*, review granted June 30, 2021, S268320, which involves discovery of a parole search condition. In this case, the Attorney General did not raise the issue in an answer to Tacardon's petition for review, and neither party has briefed it. Moreover, the question is premature given our remand for further factual findings necessary to determine when Tacardon was detained.

## III.  DISPOSITION

The judgment of the Court of Appeal is reversed and the case is remanded for further proceedings consistent with this opinion.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**KRUGER, J.**
**JENKINS, J.**
**GUERRERO, J.**

PEOPLE v. TACARDON

S264219

Concurring and Dissenting Opinion by Justice Groban

I agree with the majority opinion that we should "remand the matter for a new factual finding as to whether Tacardon was aware of the [passenger's] detention and to assess whether Tacardon was detained under the totality of the circumstances." (Maj. opn., *ante*, at p. 30.) However, the opinion further concludes that "Tacardon was not detained when Deputy Grubb parked behind the BMW, shined a spotlight on it, and began to approach on foot." (Maj. opn., *ante*, at p. 15.) Conversely, the dissenting opinion concludes defendant Leon William Tacardon was detained at this point in the interaction without reasonable suspicion in violation of the Fourth Amendment. (Dis. opn., *post*, at pp. 1–2.) As to this issue, I would take a different approach from both the majority opinion and the dissenting opinion.

As both the majority and dissent recognize, the shining of a police spotlight on a suspect can contribute to the coerciveness of the encounter and is a factor that must be considered as part of the relevant totality of circumstances inquiry. (Maj. opn., *ante*, at pp. 1, 6, 14–16; dis. opn., *post*, at pp. 3, 7–8.) I think it is a close question whether Tacardon was detained when Deputy Grubb made a U-turn, parked behind his car, shined a spotlight on it, and began to approach on foot. But we do not need to reach this question. We are already remanding for the superior court to determine whether these facts, *plus* Tacardon's possible awareness of his passenger's detention, constituted a detention of Tacardon. I would therefore let the superior court assess the totality of relevant facts rather than have this court make a determination now with respect to only some of them.

1

**GROBAN, J.**

PEOPLE v. TACARDON

S264219

Dissenting Opinion by Justice Liu

As today's opinion recounts, Sheriff's Deputy Joel Grubb was patrolling a residential neighborhood at night in a marked car and "had both his headlights and high beams on for 'extra visibility.' He drove past a BMW legally parked in front of a residence, in the vicinity of a streetlight. The car's engine and headlights were off; smoke emanated from slightly open windows. He saw three people inside and made eye contact with the occupants as he drove past them. Grubb made a U-turn, parked about 15 to 20 feet behind the BMW, and turned on his spotlight. He did not activate his siren or emergency lights or issue any commands to the car's occupants. He sat in his patrol car for 15 to 20 seconds while he informed dispatch of his location. He then approached the BMW at a walking pace. He did not draw a weapon." (Maj. opn., *ante*, at pp. 1–2.) There is more to the encounter (*id.* at pp. 2–3), but my disagreement with the court centers on these facts.

The court concludes that at this point in the interaction, defendant Leon William Tacardon, who was in the driver's seat of the BMW, was not detained within the meaning of the Fourth Amendment because a reasonable person in his position would have believed he was free to leave or otherwise terminate the encounter with Deputy Grubb. (Maj. opn., *ante*, at pp. 15–16, 19–20.) In my view, this conclusion does not accord with "[c]ommon sense." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790.) An "ordinary citizen" in Tacardon's position "would

1

not feel at liberty to simply walk [or drive] away from the officer." (*Ibid.*) I certainly wouldn't, and I suspect readers of today's opinion wouldn't either. On the facts above, I would hold that Tacardon was detained without reasonable suspicion in violation of the Fourth Amendment and that the judgment of the Court of Appeal must be reversed and the information dismissed.

## I.

The resolution of this case is straightforward under the reasoning of *People v. Kidd* (2019) 36 Cal.App.5th 12 (*Kidd*), a case with similar facts. In *Kidd*, an officer in a patrol car saw two men parked on a residential street at 1:30 a.m. (*Id.* at p. 15.) "The officer passed the car, made a U-turn, and parked about 10 feet behind the car"; he "pointed two spotlights . . . at the occupied car, and then exited his patrol vehicle." (*Ibid.*) As he approached the car, he smelled marijuana and, upon reaching the driver's side window, "shined his flashlight in the car and asked the occupants what they were doing. Kidd was in the driver's seat." (*Ibid.*) The officer observed the passenger attempting to hide bags of suspected marijuana and asked if either man was on probation or parole. (*Ibid.*) After Kidd said he was on probation, the officer ordered the men out of the car and found drugs and a gun inside the car. (*Id.* at pp. 15–16.)

"Taking into account the totality of the circumstances," the Court of Appeal explained that "Kidd was detained when the officer made a U-turn to pull in behind him and trained spotlights on his car. The officer did not block Kidd's car in, and he did not illuminate his colored emergency lights, so as to unambiguously signal a detention. Nevertheless, motorists are trained to yield immediately when a law enforcement vehicle

pulls in behind them and turns on its lights. Regardless of the color of the lights the officer turned on, a reasonable person in Kidd's circumstances 'would expect that if he drove off, the officer would respond by following with red light on and siren sounding . . . .' [Citation.] Moreover, any ambiguity was removed when the officer more or less immediately exited his patrol vehicle and began to approach Kidd's car. Although the officer's approach was . . . not made in a particularly aggressive or intimidating manner, a reasonable person in Kidd's circumstances would not have felt free to leave." (*Kidd, supra,* 36 Cal.App.5th at pp. 21–22.)

Today's opinion rejects this commonsense conclusion and says that a police officer's "use of a spotlight, standing alone, does not necessarily effect a detention." (Maj. opn., *ante,* at p. 15.) But *Kidd*'s reasoning is consistent with that proposition. (See *Kidd, supra,* 36 Cal.App.5th at p. 21 ["Without more, a law enforcement officer shining a spotlight on a person does not constitute a detention."].) The disagreement here concerns what significance a court should assign to the use of a spotlight in considering whether the totality of circumstances of a nighttime police encounter amounts to a detention.

Today's opinion relies on cases involving spotlights where the Courts of Appeal and federal and sister-state courts have held that no detention occurred. (Maj. opn., *ante,* at pp. 9–11.) But those cases are not binding on us, and the fact that *Kidd* is in the minority does not diminish the soundness of its reasoning. (Cf. *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 331 [adopting minority position even though "[a] greater number of cases . . . have taken the opposite view"]; *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 834 [adopting Court of Appeal position even though "most other courts addressing the

3

issue . . . have taken a contrary approach"]; *People v. Scott* (1994) 9 Cal.4th 331, 353 & fn. 16 [adhering to "th[e] minority view" while "recogniz[ing] that the weight of authority is otherwise"].)

In reaching today's holding, the court contends that although activation of red and blue emergency lights "typically conveys a command to stop," "the use of a spotlight generally conveys a different meaning to a reasonable person . . . ." (Maj. opn., *ante*, at p. 13.) Because "[a] spotlight can be used to illuminate the surrounding area for safety or other purposes unrelated to the projection of authority" (*id.* at pp. 13–14), the court "believe[s] a reasonable person would distinguish between a spotlight and red and blue emergency lights in considering whether the person was free to leave" (*id.* at pp. 14–15; see *id.* at p. 13 ["[A] reasonable person would understand that spotlights can have a practical function that differs from the essentially communicative function of emergency lights."]).

I imagine this conclusion comes as news to anyone who has ever had their car illuminated by a police spotlight. The court apparently envisions that a reasonable person in Tacardon's circumstances would think, "Oh, the officer who just eyeballed me, made a U-turn, pulled up behind me in his patrol car, pointed a bright spotlight at my car, got out of his car, and is now walking toward me isn't trying to stop me. He just turned on his spotlight to see what's going on. *Good thing he didn't turn on his emergency lights* . . . looks like I'm free to leave." This strains credulity. The spotlight, whatever its "practical function" (maj. opn., *ante*, at p. 13), contributes to the officer's show of authority. No reasonable person would feel free to leave in such circumstances. A reasonable person would instead submit to the officer's approach and stay put.

In this case, Deputy Grubb may well have "used the spotlight as a matter of course" (maj. opn., *ante*, at p. 16) for "purposes unrelated to the projection of authority" (*id.* at p. 14). And it is reasonable to believe that using a spotlight in dark conditions "might help both the officer and the civilian see what the other is doing and make decisions accordingly." (*Ibid.*) "The ultimate question, however, is not the abstract reasonableness of the officer's actions" or the purposes behind those actions "but rather the *effect* of the cumulative show of authority on a reasonable person's assessment of whether they are free to terminate the encounter with law enforcement." (*People v. Kasrawi* (2021) 65 Cal.App.5th 751, 758–759.) Even if it is reasonable for an officer to use a spotlight for illumination during a nighttime encounter with a parked motorist, the question is what the motorist would reasonably believe when confronted with the officer's actions. And it is evident from ordinary experience that "an officer's show of authority is usually bolstered by a spotlight — even if it is used primarily for safety purposes . . . ." (*Id.* at p. 760.)

Here, Deputy Grubb did not use his spotlight to illuminate a general area for investigation. Instead, he pointed the spotlight at Tacardon's parked car after making eye contact with its occupants, making a U-turn, and pulling up behind the car. A reasonable person would have concluded that the officer activated the spotlight and trained it on the car as part of a series of targeted actions to detain the car and its occupants. The court says that "[w]hile a reasonable person in Tacardon's position might 'feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention.' " (Maj. opn., *ante*, at p. 20.) To be sure, "[p]olice officers are as free as any other citizen to knock on someone's door and ask to talk with

them, to approach citizens on the street or in their cars and to ask for information or their cooperation." (*State v. Garcia-Cantu* (Tex.Crim.App. 2008) 253 S.W.3d 236, 243 (*Garcia-Cantu*).) But it is equally true that such scrutiny can amount to a detention in certain circumstances. The question is whether a reasonable person would feel free to leave or terminate the encounter, and the fact that activation of a spotlight causes a person to " 'feel himself the object of official scrutiny' " (maj. opn., *ante*, at p. 20) is probative, even if not dispositive.

Today's opinion says, "There was no evidence [the spotlight] was unusually bright or flashing, or that Tacardon was blinded or overwhelmed by the light. Certainly, a reasonable person would notice the deputy's use of a spotlight, and depending on how it is used, a spotlight may contribute to the coerciveness of a police encounter." (Maj. opn., *ante*, at p. 16.) But the fact that a spotlight has a disorienting effect that augments a police officer's show of authority and the coerciveness of the encounter is a matter of common experience to civilians and officers alike. (See Santos, *Making Nighttime Traffic Stops* (June 20, 2012) Police Magazine [instructing police to "[u]se your high beams, spotlights, and takedowns" to "creat[e] a 'Wall of Light' that will overwhelm the occupants of the subject vehicle with intense light"]; Rayburn, Advanced Vehicle Stop Tactics: Skills for Today's Survival Conscious Officer (2010) p. 4 [instructing officers that "[t]he spotlight will make it difficult for the operator of the vehicle to see"].)

Further, it does not matter whether an officer is "attempting to blind the driver" (maj. opn., *ante*, at p. 15) or whether, in Deputy Grubb's view, the spotlight's "use in this circumstance was disorienting" or "whether he had been trained to use his spotlight in that fashion" (*id.* at p. 16). What matters

is the effect, which courts routinely infer from the totality of the circumstances. (See *U.S. v. Delaney* (D.C. Cir. 2020) 955 F.3d 1077, 1083 [shining a police "cruiser's take-down light" into a stopped car from behind " 'provide[s] protection for an officer by blinding and disorienting the car's occupants if they look back at the squad car' "]; *U.S. v. Sigmond-Ballesteros* (9th Cir. 2002) 285 F.3d 1117, 1123 ["The sudden introduction of a light source into the driver's compartment of a vehicle, while the vehicle is operated at night, can be disruptive and can lead to a decrease in visibility, if not temporary blindness."]; *Garcia-Cantu*, *supra*, 253 S.W.3d at p. 240 [occupant of a car illuminated from behind may be unable to "see anything more except a big spotlight, 'a big white light' "].)

To be clear, I do not urge a per se rule that "any person who is aware of police scrutiny and is then illuminated by a spotlight is necessarily detained." (Maj. opn., *ante*, at p. 19; see *Garcia-Cantu*, *supra*, 253 S.W.3d at p. 244 ["*per se* rules generally do not determine whether any specific citizen-police encounter amounted to a Fourth Amendment detention"; courts must examine the totality of the circumstances].) And I agree that relevant circumstances may include whether the officer stopped a moving vehicle, blocked a person from driving away, gave instructions by loudspeaker, approached aggressively, used a commanding tone of voice, or drew a weapon. (Maj. opn., *ante*, at pp. 6, 15–16.) My objection is to the court's conclusion that Deputy Grubb's use of a spotlight to illuminate Tacardon's car lacked "coercive force" that informed whether a reasonable person would have felt free to terminate the encounter. (*Id.* at p. 16.) I would hold that shining a police spotlight to illuminate a parked car on a residential street contributes to the coerciveness of the encounter in the circumstances here, where

it was preceded by an officer on patrol making eye contact with the car's occupants, making a U-turn, and pulling up behind the car, and then followed a few seconds later by the officer getting out of his patrol vehicle and approaching the car.

## II.

Although I acknowledge there is case law that supports today's holding (maj. opn., *ante*, at pp. 9–11), it must also be acknowledged that judicial application of the "free to leave" standard has long been criticized for having "an air of unreality" and for lacking "common . . . understanding" of how civilians experience encounters with the police. (*United States v. Drayton* (2002) 536 U.S. 194, 208, 210 (dis. opn. of Souter, J.); see *State v. Fogg* (Iowa 2019) 936 N.W.2d 664, 675–677 (dis. opn. of Appel, J.) [citing criticism by justices of the United States Supreme Court, lower court judges, and scholars]; Sundby*, The Rugged Individual's Guide to the Fourth Amendment: How the Court's Idealized Citizen Shapes, Influences, and Excludes the Exercise of Constitutional Rights* (2018) 65 UCLA L.Rev. 690, 718, 721 (Sundby) [4th Amend. jurisprudence has a "tone of obliviousness" and "does not accord with reality"]; LaFave, *Pinguitudinous Police, Pachydermatous Prey: Whence Fourth Amendment "Seizures"?* (1991) 1991 U. Ill. L.Rev. 729, 739–740 ["[T]he Court finds a perceived freedom to depart in circumstances when only the most thick-skinned of suspects would think such a choice was open to them."].)

To say that a person in Tacardon's position was experiencing a "consensual contact" with Deputy Grubb (maj. opn., *ante*, at p. 19) is to proffer a rather sanguine and empirically dubious view of police-citizen interactions. (Kessler, *Free to Leave? An Empirical Look at the Fourth*

*Amendment's Seizure Standard* (2009) 99 J. Crim. L. & Criminology 51, 62 ["[T]here is a wealth of evidence from psychological studies suggesting that people rarely comply freely with requests from police officers."]; see, e.g., Sommers & Bohns, *The Voluntariness of Voluntary Consent: Consent Searches and the Psychology of Compliance* (2019) 128 Yale L.J. 1962; Smith et al., *Testing Judicial Assumptions of the "Consensual" Encounter: An Experimental Study* (2013) 14 Fla. Coastal L.Rev. 285; Lichtenberg, Miranda *in Ohio: The Effects of* Robinette *on the "Voluntary" Waiver of Fourth Amendment Rights* (2001) 44 How. L.J. 349.)

Professor LaFave, while recognizing the " 'moral and instinctive pressures to cooperate' " with the police, has said: "[T]he confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse. The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens." (4 LaFave, *Search and Seizure* (6th ed. 2022) § 9.4(a), fns. omitted.) Singling out a parked car and training a powerful spotlight on it from behind, as Deputy Grubb did here, is "conduct significantly beyond" any sort of "nonoffensive contact . . . between two ordinary citizens." (*Ibid.*; see Veh. Code, § 24409, subd. (b) [prohibiting use of high beams "[w]henever the driver of a vehicle follows another vehicle within 300 feet to the rear"].)

As the court suggests, Fourth Amendment doctrine on police use of spotlights is significantly animated by safety concerns. (Maj. opn., *ante*, at pp. 13–14; see *U.S. v. Tanguay* (1st Cir. 2019) 918 F.3d 1, 7–8.) Yet one might wonder whether

today's opinion creates new safety issues for both officers and civilians. By holding that Tacardon was not detained at the point when Deputy Grubb had activated his spotlight and began to approach on foot, the court contemplates that a person in Tacardon's position may simply drive away without warning — even if an officer is walking toward the car and even if a passenger, desiring to leave the encounter, is exiting the car. Such a scenario would not promote the safety of either officers or civilians.

The fact is that notwithstanding today's decision, reasonable persons in Tacardon's position will not drive away because they will not feel free to leave. A more realistic statement of today's holding is that even though the use of a spotlight will often contribute to the coerciveness of a nighttime encounter, this circumstance simply does not outweigh safety concerns in the Fourth Amendment analysis. A carveout for spotlights would arguably put officers on the same footing, day or night, with regard to investigatory activities like approaching a parked car.

Yet there is no policy or principle of which I am aware that says the police must have the same latitude for conducting investigation during the night as during the day. To the contrary, California law distinguishes between daytime and nighttime intrusions by police. (See Pen. Code, § 840 ["An arrest for the commission of a misdemeanor or an infraction cannot be made between the hours of 10 o'clock p.m. of any day and 6 o'clock a.m. of the succeeding day, unless" certain criteria are met]; *id.*, § 1533 [requiring showing of good cause before magistrate may approve service of search warrant between 10:00 p.m. and 7:00 a.m.]; *Tuttle v. Superior Court* (1981) 120 Cal.App.3d 320, 331 ["By adopting Penal Code section 1533, the

Legislature has clearly taken note that there is a special threat to privacy presented by nighttime police intrusions."].) Moreover, courts have refused to credit darkness as an excuse for police intrusions conducted without reasonable suspicion. (See, e.g., *U.S. v. Wilson* (4th Cir. 2000) 205 F.3d 720, 723–724 [vacating conviction stemming from vehicle pullover conducted because officer, due in part to darkness, could not read expiration date on vehicle's registration tag]; *U.S. v. McLemore* (8th Cir. 2018) 887 F.3d 861, 866 [rejecting government's argument that inability to read temporary license plate due to darkness justified police stop and affirming suppression of evidence].)

Recognizing the coercive effect of spotlights would likely limit some nighttime investigations, including ones like Deputy Grubb's that turn up contraband. However, for every suspicionless stop that uncovers criminal activity, there are many others that come up empty. (See Bar-Gill & Friedman, *Taking Warrants Seriously* (2012) 106 Nw. U. L.Rev. 1609, 1655 ["police find evidence in only about 10% to 20% of the total traffic searches"].) And "it is no secret that people of color are disproportionate victims of this type of [suspicionless] scrutiny." (*Utah v. Strieff* (2016) 579 U.S. 232, 254 (dis. opn. of Sotomayor, J.); see Ayres & Borowsky, A Study of Racially Disparate Outcomes in the Los Angeles Police Department (Oct. 2008) pp. 5–8 [Black and Hispanic residents of Los Angeles, compared to Whites, were more likely to be stopped, frisked, searched, and arrested but significantly less likely to be found with weapons or drugs]; Gross & Barnes, *Road Work: Racial Profiling and Drug Interdiction on the Highway* (2002) 101 Mich. L.Rev. 651, 668 [searches of White drivers in Maryland reveal drugs 22% more often than searches of Black drivers and

over 200% more often than searches of Hispanic drivers]; Note, *Discrimination During Traffic Stops: How an Economic Account Justifying Racial Profiling Falls Short* (2012) 87 N.Y.U. L.Rev. 1025, 1040 [searches of White drivers in Illinois reveal contraband over 50% more often than searches of non-White drivers]; cf. Kang et al., *Implicit Bias in the Courtroom* (2012) 59 UCLA L.Rev. 1124, 1142 ["the conditions under which implicit biases translate most readily into discriminatory behavior are when people have wide discretion in making quick decisions with little accountability"].)

Moreover, not all individuals feel the same degree of freedom to rebuff police advances, even if the law says they are free to leave. (See Pierson et al., *A large-scale analysis of racial disparities in police stops across the United States* (July 2020) 4 Nature Human Behaviour 736, 739 [Black and Hispanic drivers are twice as likely as White drivers to undergo search when stopped by police]; cf. *Utah v. Strieff, supra,* 579 U.S. at p. 254 (dis. opn. of Sotomayor, J.) ["For generations, black and brown parents have given their children 'the talk' — instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger — all out of fear of how an officer with a gun will react to them."].) Would a reasonable person in Tacardon's position feel free to drive away from Deputy Grubb or otherwise refuse to cooperate? The court's holding leaves many citizens " 'in a "Catch-22." Exercise of citizen rights in the face of police rights may cause police to escalate the intrusiveness of the encounter and place the citizen at risk of both physical harm and formal arrest. Failure to exercise citizen rights by responding to the officer, however, may be viewed as consensual conduct removing the encounter from Fourth Amendment analysis.' " (*State v.*

*Fogg*, *supra*, 936 N.W.2d at p. 681 (dis. opn. of Appel, J.); see Sundby, *supra*, 65 UCLA L.Rev. at p. 726 [such deprivation of constitutional rights "undermines the trust and legitimacy with which the justice system is viewed by minority communities"].)

In sum, today's opinion stretches the concepts of a "consensual encounter" and being "free to leave" beyond the bounds of common understanding and ordinary experience. I fear that the benefits of the court's decision, which expands the investigatory authority of the police, will come at the cost of subjecting more law-abiding persons to unwarranted surveillance, creating more police-civilian interactions with the potential for misunderstanding or escalation, and deepening the distrust that some communities have long had toward law enforcement.

I respectfully dissent.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Tacardon

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 53 Cal.App.5th 89
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S264219
**Date Filed:**  December 29, 2022

_____

**Court:**  Superior
**County:**  San Joaquin
**Judge:**  Michael J. Mulvihill, Jr.

_____

**Counsel:**

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Appellant.

Paul Kleven, under appointment by the Supreme Court, for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher J. Rench
Deputy Attorney General
1300 I Street
Sacramento, CA 94244-2550
(916) 210-7661

Paul Kleven
Attorney at Law
1604 Solano Avenue
Berkeley, CA 94707
(510) 528-7347