# IN THE SUPREME COURT OF IOWA

No. 21–0828

Submitted September 29, 2023—Filed November 17, 2023

**STATE OF IOWA,**

   Appellee,

vs.

**JAHEIM ROMAINE CYRUS,**

   Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Brendan E. Greiner (suppression ruling) and Odell G. McGhee II (sentencing), District Associate Judges.

Defendant, claiming he was unlawfully seized in his parked car, seeks further review of court of appeals decision that affirmed the district court's ruling denying his motion to suppress. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, Appellate Defender, and Josh Irwin (argued) and Stephan J. Japuntich (until withdrawal), Assistant Appellate Defenders, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester (argued), Assistant Attorney General, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether the defendant was seized in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. A woman called the police to report a suspicious car parked in front of her home at night. A uniformed police officer responded in a marked patrol car and pulled alongside the parked car, activated rear-facing lights, shined a mounted spotlight into the car, and walked over and asked the driver, "How are you tonight?" Upon smelling a strong odor of burnt marijuana, the officer searched the driver, found a bullet in his pocket and a stolen loaded handgun in his front-seat console, and arrested him. The defendant, charged with firearm violations, filed a motion to suppress, which the district court denied, finding the officer did not seize him before detecting the odor of marijuana. The defendant, a nineteen-year-old Black male, was convicted on the minutes of testimony and appealed, arguing his minority status should have been considered in evaluating whether he had been seized at the outset of the encounter. We transferred the case to the court of appeals, which affirmed the suppression ruling. We granted the defendant's application for further review.

On our de novo review, we agree with the district court and court of appeals that the officer did not unlawfully seize the defendant. We apply an objective totality-of-the-circumstances test. The lone officer did not activate his siren or front-facing emergency lights, display a weapon, block in the defendant's already parked vehicle, or command the driver to stay in his car. On this record, the use of the spotlight was insufficient to escalate their initial encounter into a seizure. We follow the great weight of authority and decline to modify our objective "reasonable person" test to factor in the defendant's race in evaluating the officer's actions. For the reasons further explained below, we affirm the

decision of the court of appeals and the district court's suppression ruling and judgment of conviction.

## I. Background Facts and Proceedings.

At 9:20 p.m. on October 16, 2020, less than five months after George Floyd's fatal encounter with Minneapolis police, a woman called the Des Moines Police Department to report a "suspicious" car on Ashby Avenue. She said the car initially stopped in her neighbors' driveway, then parked nearby on the street before moving again to remain in front of her home. When asked what kind of car she saw, the caller said, "[A] gold Impala. Like an older, like probably 2005, 2006." But when asked for the license plate, she said that she could not see it. A uniformed police officer, Shawn Morgan, was dispatched to investigate.

Officer Morgan drove to the caller's neighborhood in his marked patrol car, and the Impala came into his view. The Impala was legally parked with its engine off on the north side of the T-intersection at Ashby Avenue and 26th Place. Officer Morgan aimed his mounted, directional spotlight to "attempt to see into the vehicle" and "see who was sitting in the vehicle or what was going on in the vehicle." Officer Morgan turned on his patrol car's rear-facing lights "to make sure anyone coming from behind didn't strike [his] vehicle." He did not activate his siren or front-facing emergency top lights.

Officer Morgan's dashcam video shows that as he slowly pulled alongside the Impala, Jaheim Cyrus, the Impala's driver, opened its door into the patrol car's path.[1] Officer Morgan stopped in the middle of the street, without blocking in the Impala. Cyrus looked back at Officer Morgan and showed his hands. Cyrus stayed in the Impala; the spotlight was still directed at the left side of the Impala. As Officer Morgan exited his patrol car, he said in a conversational tone, "How

---

[1]Officer Morgan did not capture the interaction with Cyrus on his bodycam. He "forgot to grab it off the charger" because he "exited the vehicle a little bit quicker than [he] normally would have."

are you tonight?" Those words are clearly heard on the dashcam audio. No further conversation between the officer and driver is audible as Officer Morgan walked around the front of the patrol car, nodded his head toward Cyrus, and spoke into his shoulder-mounted radio. Cyrus put one foot outside the Impala and placed his left hand on top of the car door—as if to get out—but then sat back into the driver's seat.

Cyrus testified at the suppression hearing that he asked the officer something like, "Can I get out of my car?" and was told, "No, just stay in the car." Cyrus did not describe the officer's tone. Officer Morgan testified he did not recall directing Cyrus to remain in the car and his practice is not to give such a command when first responding to "suspicious vehicle" complaints, which often "don't involve criminal activity."

The video shows Officer Morgan walking to the rear of the Impala. The dashcam audio recorded the officer's recitation of the license plate number moments later. Next, Officer Morgan walked to the driver's-side window where, as he later testified, he "immediately smelled the strong odor of burnt marijuana." He then placed his left hand on the top of the car door and asked Cyrus for his identification. He noticed Cyrus's hands were shaking. He opened the car door, pulled out his flashlight, and asked Cyrus about the marijuana odor; Cyrus denied using or possessing any marijuana.

Officer Morgan placed Cyrus in handcuffs, patted him down, and found a round of ammunition in his left front jacket pocket. He put Cyrus in the back seat of his patrol car before searching the Impala. Officer Morgan discovered a Ruger LC9 9 mm handgun with an extended magazine holding nine live rounds of ammunition in the center console.

As Officer Morgan read Cyrus his Miranda warning, he noticed a "green leafy substance" on Cyrus's tongue and bottom molars. Cyrus admitted to eating

a small blunt and said it was the first day he had ever used marijuana. Cyrus explained that he was in the neighborhood to see his girlfriend because they had just had a fight, and he was waiting for her to get home. Cyrus admitted to parking several places on the street because he did not know her exact address. Cyrus denied knowing anything about the Ruger, which Officer Morgan later learned was reported stolen. Like the Ruger, the round of ammunition found in Cyrus's pocket was 9 mm. The bullet found in Cyrus's pocket matched that weapon. Cyrus was charged by trial information with carrying weapons under Iowa Code § 724.4(1) (2020) and fourth-degree theft under Iowa Code § 714.2(4).

Cyrus filed a motion to suppress, arguing the totality of the encounter with Officer Morgan constituted an illegal seizure violating both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. The district court conducted an evidentiary hearing on the motion to suppress. Cyrus and Officer Morgan testified, and the dashcam video was admitted into evidence. Cyrus testified that Officer Morgan had ordered him back into the car; Officer Morgan testified he did not recall doing so and would not have done so under the circumstances presented. Cyrus did not testify that he was aware the patrol car's rear-facing lights were on or that his Impala was blocked in.

The district court denied the motion to suppress, finding that Cyrus was not seized during the brief encounter before Officer Morgan smelled marijuana and detained him on that ground. The district court declined to find that Officer Morgan had ordered Cyrus to remain in his car during the roughly ten seconds before he smelled marijuana. The court found Cyrus "not credible" because "the video fails to corroborate his testimony" and the State impeached Cyrus for convictions involving crimes of dishonesty based on his prior theft and burglary convictions. The court declined to give weight to Cyrus's subjective feelings or

find Officer Morgan's use of the spotlight established a seizure. The court also declined Cyrus's invitation to consider his age and race in determining whether a person in his situation would have felt free to leave.

Cyrus stipulated to a trial on the minutes of testimony and was convicted of carrying weapons. His sentence was suspended, and he was placed on probation.

Cyrus appealed the denial of the motion to suppress. Cyrus argued that he was seized when the officer "pulled up beside his car, trained a spotlight on him and activated the rear-facing directional lights of the police cruiser." He argued that a reasonable person would not have felt free to leave. Cyrus also argued that the reasonable person test should be broadened to include a new factor: Cyrus's minority status, including "the racial differences in how police action is perceived." Lastly, Cyrus argued for the first time on appeal that the reasonable person test should be replaced with a "strict scrutiny standard." He made no strict scrutiny argument in district court.

We transferred this case to the court of appeals, which affirmed the district court's denial of Cyrus's motion to suppress. The court of appeals analyzed each factor—the rear-facing lights, the spotlight, and the location of the patrol car—and concluded that Officer Morgan did not engage in an illegal seizure "beyond that accepted in social intercourse." The court of appeals determined that the use of the rear-facing lights, "particularly if not seen by the driver, is insufficient on its own to establish a seizure." The appellate court concluded that a spotlight is not as coercive as emergency top lights that "invoke police authority and imply a police command to stop and remain." The court of appeals added that the patrol car did not block in Cyrus's Impala. Finally, the court of appeals declined to consider Cyrus's "minority status [as] relevant in our analysis."

We granted Cyrus's application for further review.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019) (quoting *State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018)). "Each case must be evaluated in light of its unique circumstances." *Id.* (quoting *Coffman*, 914 N.W.2d at 244). "We review the entire record to independently evaluate the totality of the circumstances . . . ." *State v. Torres*, 989 N.W.2d 121, 126 (Iowa 2023) (omission in original) (quoting *State v. Hauge*, 973 N.W.2d 453, 458 (Iowa 2022)). "[W]e give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings." *Id.* (alteration in original) (quoting *Hauge*, 973 N.W.2d at 458). The defendant bears the burden of proof as to whether a seizure occurred. *Fogg*, 936 N.W.2d at 668.

## III. Analysis.

We must decide whether Officer Morgan "seized" Cyrus during their ten- to fifteen-second interaction before the officer smelled burnt marijuana and detained him for that reason. Cyrus argues he was seized in violation of both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution, and he argues we should construe the Iowa clause as providing greater protection against seizures than the Fourth Amendment. Because the federal and Iowa search and seizure clauses are worded nearly identically and we are not persuaded to apply them differently in this case, we will analyze both provisions together. *See State v. Brown*, 930 N.W.2d 840, 847 (Iowa 2019) ("We generally 'interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations

of the Fourth Amendment' because of their nearly identical language." (quoting *State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008))).

"[W]hether a seizure occurred is determined by the 'totality of the circumstances.' " *Fogg*, 936 N.W.2d at 668. (quoting *State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008)). Specifically, "objective indices of police coercion must be present to convert an encounter between police and citizens into a seizure." *Id.* (quoting *Wilkes*, 756 N.W.2d at 843). No seizure occurs if a reasonable person would feel free to leave. *Id.*

"Factors that might suggest a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Wilkes*, 756 N.W.2d at 842–43 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The use of sirens, flashing lights or other signals to pull a moving vehicle to the side of the road might also constitute a show of authority that is a seizure." *State v. Harlan*, 301 N.W.2d 717, 720 (Iowa 1981). We find none of those factors occurred before Cyrus's lawful detention for marijuana use.

Cyrus argues Officer Morgan seized him by the combination of several police actions: (1) stopping his patrol car in the middle of the street with rear-facing lights activated while partially blocking Cyrus's exit; (2) shining the spotlight into Cyrus's vehicle; and (3) the officer's quick exit and order for Cyrus to stay in the car. The State responds that Cyrus was not blocked in and never claimed he saw the rear-facing lights; the officer's use of the rear-facing lights and spotlight was appropriate at night; no siren or front-facing emergency lights were activated; and, as the district court found, the officer's initial greeting ("How are you tonight?") was *not* followed with a command to stay in the car. The district court and court of appeals determined that Cyrus failed to meet his

burden of proof to show he was seized. Based on our de novo review of the record, we agree Cyrus was not seized before the officer smelled burnt marijuana.

We will address each factor argued by Cyrus and then explain why we decline Cyrus's invitation to modify our objective test for seizure to include taking into consideration his age and race.

**A. The Patrol Car's Positioning in the Street with Rear-Facing Lights Activated.** Officer Morgan was responding to a citizen report of a suspicious vehicle—an older gold Impala. Although the officer could have pulled in behind the Impala, he drove slowly alongside it when Cyrus abruptly opened his car door into the patrol car's path. Officer Morgan understandably stopped in the road. He had prudently activated his rear-facing lights before stopping as a precaution against another nighttime driver rear-ending his patrol car. The rear-facing lights are not visible on the dashcam video, and Cyrus, who testified at the suppression hearing while represented by counsel, never claimed he saw them. We have held that merely activating rear-facing lights, without using the front-facing emergency lights or siren, is insufficient to constitute a seizure. *See State v. Prusha*, 874 N.W.2d 627, 628, 630 (Iowa 2016); *see also United States v. Tanguay*, 918 F.3d 1, 8 (1st Cir. 2019) (finding no seizure when an officer "activated only his rear-facing lights, and Tanguay, who was already stopped, makes no claim to have been able to see them"). We reach the same conclusion here.

Nor is the patrol car's position "in the middle of the street" sufficient. *See People v. Luedemann*, 857 N.E.2d 187, 204 (Ill. 2006) (declining to hold that a police officer's stopping in middle of the roadway "in a manner not allowed for private citizens is inherently coercive" and reversing the finding that a seizure occurred). Importantly, Cyrus was not blocked in. *See id.* at 205 (noting that the officer did not block in the defendant). The testimony at the suppression hearing

and dashcam video confirmed Cyrus had room to pull forward and turn around to drive away. *See Fogg,* 936 N.W.2d at 670 (determining the driver was not seized when the officer stopped in an alley blocking her path forward because "[s]he was not boxed in" as "she could have driven backward either with or without turning around"). We agree with the district court and court of appeals that these actions by Officer Morgan did not establish a seizure.

**B. Officer Morgan's Use of the Spotlight.** We next address a factor missing in *Fogg*: the officer's use of his patrol car's attached directional spotlight. *See id.* at 669 (noting that the officer "did not shine a light into . . . Fogg's vehicle"). Officer Morgan was responding to a nighttime complaint of a suspicious vehicle. Aiming his spotlight into the Impala from alongside enabled him to see if the car had any occupants. We have held that an officer did not seize a driver by shining a flashlight into the car. *See Harlan,* 301 N.W.2d at 719, 720 (noting that the "officer, like any other citizen, had a right to look into the car" and concluding that this was "an innocuous police–citizen encounter that did not implicate the fourth amendment"). Indeed, the neighbor who phoned in the suspicious vehicle report lawfully could have shined her own flashlight into the Impala. It would be unreasonable to expect an officer responding to a nighttime report of a suspicious vehicle to approach the darkened car without illuminating its interior. *See People v. Tacardon,* 521 P.3d 563, 570–71 (Cal. 2022) ("A spotlight can be used to illuminate the surrounding area for safety or other purposes . . . [and] might help both the officer and the civilian see what the other is doing and make decisions accordingly.").

In *People v. Tacardon,* the California Supreme Court recently declined to impose a bright-line rule that the use of a spotlight constitutes a seizure:

> A court must consider the use of a spotlight together with all of the other circumstances. It is certainly possible that the facts of a particular case may show a spotlight was used in an authoritative

manner. These may include flashing lights at the driver to pull the car over or attempting to blind the driver, which would be relevant considerations under the totality of the circumstances. But use of a spotlight, standing alone, does not necessarily effect a detention.

*Id.* at 571 (citation omitted) (finding no seizure when the officer trained a spotlight at a parked vehicle). The dissent did not favor a per se rule either, but it gave more weight to the use of the spotlight:

> The court apparently envisions that a reasonable person in Tacardon's circumstances would think, "Oh, the officer who just eyeballed me, made a U-turn, pulled up behind me in his patrol car, pointed a bright spotlight at my car, got out of his car, and is now walking toward me isn't trying to stop me. He just turned on his spotlight to see what's going on. *Good thing he didn't turn on his emergency lights* . . . looks like I'm free to leave." This strains credulity.

*Id.* at 580 (Liu, J., dissenting). The dissent, on the facts of that case, concluded that a seizure was shown. *Id.* at 581.

Other courts have held that the use of a spotlight is a factor to consider but not, by itself, a per se seizure. *See, e.g., State v. Baker*, 107 P.3d 1214, 1218 (Idaho 2004) (stating that Idaho "joins the many other jurisdictions which have held that the use of a spotlight alone would not lead a reasonable person to believe that he was not free to leave, though it may be considered under the totality of the circumstances"); *Luedemann*, 857 N.E.2d at 206 ("Courts in other jurisdictions have also generally found that the use of a flashlight or a spotlight, without other coercive behavior, is insufficient to transform a consensual encounter into a seizure."). We agree and likewise decline to impose a bright-line per se rule.

The United States Court of Appeals for the Eighth Circuit addressed the use of a spotlight under similar circumstances in *United States v. Mabery*, 686 F.3d 591 (8th Cir. 2012). There, officers responded to a nighttime report of a suspicious Jeep legally parked by an apartment building. *Id.* at 594. When the driver noticed the patrol car, he turned off his dome light. *Id.* An officer stopped

the patrol car in the street and spotlighted the Jeep. *Id.* Another officer activated the patrol car's rear emergency lights. *Id.* Mabery opened the Jeep door and got out. *Id.* The Eighth Circuit panel reasoned that the act of shining a spotlight on a vehicle was "no more intrusive (and arguably less so) than knocking on the vehicle's window." *Id.* at 597. The officers did not give commands or draw their weapons. *Id.* These facts, taken together, did not "indicate anything more than an otherwise-routine police–citizen encounter." *Id.* at 596; *see also United States v. Campbell-Martin*, 17 F.4th 807, 814 (8th Cir. 2021) (applying *Mabery* to find that the use of a spotlight was not a seizure); *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) ("The act of shining a spotlight on a person's car typically does not constitute a seizure for purposes of the Fourth Amendment."). We reach the same conclusion on our record.

Other courts have also found that an officer's use of a spotlight did not constitute a seizure. *See, e.g.*, *People v. Cascio*, 932 P.2d 1381, 1388 (Colo. 1997) (en banc) ("[T]he flashlights and spotlight were used as a matter of practical necessity as the encounter took place when it was getting dark, and we do not attribute any significance to their use."); *State v. Clayton*, 45 P.3d 30, 34 (Mont. 2002) (holding that there was no seizure when the officer used the spotlight not as a show of authority but rather "to determine the number of passengers and what the driver was up to"); *State v. Calhoun*, 792 P.2d 1223, 1225 (Or. Ct. App. 1990) (holding that the use of a spotlight did not alter the encounter into a seizure); *cf. State v. O'Neill*, 62 P.3d 489, 497 (Wash. 2003) (en banc) (holding that no seizure occurred when the officer used a flashlight "to see what would be observable in daylight").

We agree that training a spotlight at the driver could be a factor in establishing a seizure.[2] But on this record, we find that Officer Morgan's use of the spotlight did not escalate his investigation into a seizure of Cyrus.[3]

**C. Officer Morgan's Quick Exit and Statements.** Cyrus also contends a seizure is shown by Officer Morgan's quick exit from the patrol car and telling Cyrus to stay in his car. The officer testified that he exited his patrol car quicker than he normally would, but our own review of the dashcam video shows him walking casually, not hurriedly, to Cyrus's Impala. It is undisputed that the officer's first words to Cyrus were, "How are you tonight?" His tone was nonthreatening and conversational. No command to stay in the car is audible. He appears to be talking into his shoulder microphone rather than to Cyrus, who sits back in his driver's seat. Although the officer acknowledged he did not remember exactly what he said next, he credibly explained that his practice under these circumstances would *not* be to give a command. The district court heard both Officer Morgan and Cyrus testify in person and found no command was given to stay in the car. The district court found Cyrus not credible, and we give weight to that credibility finding. *See Torres*, 989 N.W.2d at 126. The court noted Cyrus had prior felony convictions for crimes of dishonesty (theft and burglary).[4] We also note Cyrus lied to Officer Morgan at the scene when Cyrus

---

[2]*See United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (finding a seizure when one officer parked their patrol car in front of the defendant's car and a second officer parked their patrol car behind the defendant's car, both officers directed their spotlights at the car, and one officer approached with a flashlight and told the defendant to put their hands in the air); *State v. Garcia-Cantu*, 253 S.W.3d 236, 244–50 (Tex. Crim. App. 2008) (finding a seizure when the officer "boxed in" the defendant's truck on a dead end street, directed a spotlight at the truck, held a large flashlight into the truck, and used a commanding tone and demeanor toward the defendant).

[3]We reach the same conclusion based on the record in *State v. Wittenberg*, ___ N.W.2d ___, ___ (Iowa 2023), also decided today.

[4]*See* Iowa Rule of Evidence 5.609(*a*)(2) (allowing impeachment by evidence of a conviction of a crime involving dishonesty); *State v. Harrington*, 800 N.W.2d 46, 51 (Iowa 2011) ("It has been settled law in this state that convictions for theft and burglary with intent to commit theft are

denied possessing any marijuana, and we question his denial that he knew about the loaded 9 mm Ruger in his car's console when he also had a 9 mm round of ammunition in his jacket pocket. We agree with the district court that no command was given, and Officer Morgan's conduct did not constitute a seizure.

Cyrus had the burden to prove that he was seized by Officer Morgan. After considering Officer Morgan's actions under the totality of the circumstances and applying our objective reasonable person test, we agree with the court of appeals and the district court that no seizure occurred before Officer Morgan detected the odor of burnt marijuana, which then provided a lawful ground to detain and search Cyrus and the Impala.

**D. Cyrus's Age and Race.** Cyrus—in district court and on appeal—argues that his status as a young Black male should be considered when determining whether Officer Morgan seized him. He argues a driver's minority status affects how they perceive police actions; that is, a young Black male, months after George Floyd's death, is less likely to feel free to leave than an older white driver under the same circumstances. The State argues that "[a] reasonableness test [for seizure] that varies based on any individual's unique status would be exceedingly difficult for police officers, lawyers, judges, and even the individual affected to apply fairly." We decline Cyrus's invitation to change our objective test to consider the characteristics of the driver. Rather, we adhere to our precedent that examines the officer's conduct objectively, without varying the outcome based on the race, age, or other traits of the driver. *See Harlan*, 301 N.W.2d at 719 (holding that a seizure occurs when "the officer, by means of

---

crimes of dishonesty."). Cyrus never argued his prior convictions were not crimes involving dishonesty within the meaning of rule 5.609(*a*)(2). *See Harrington*, 800 N.W.2d at 51 n.4. When we approved substantive updates to Iowa's rules of evidence in 2022, we declined to adopt the "elements test" in Federal Rule of Evidence 609(a)(2) (requiring that the "elements of the crime required proving—or the witness's admitting—a dishonest act or false statement").

physical force or show of authority, has in some way restrained the liberty of a citizen" (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968))).

While the test is "necessarily imprecise," it "is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, [and] it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police." *Michigan v. Chesternut,* 486 U.S. 567, 574 (1988). The test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Id.* And "[c]larity as to what the law requires is generally a good thing." *Welch v. Iowa Dep't of Transp.,* 801 N.W.2d 590, 601 (Iowa 2011) (discussing the need for a "bright-line rule" that provides clear guidance to law enforcement). This is especially true "when the law governs interactions between the police and citizens" and when officers must make "quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other." *Id.* We question the practical workability and predictability of a seizure test that depends on the individual characteristics of the driver instead of the actions of the officer.

To support his argument, Cyrus relies on language taken out of context from *United States v. Mendenhall,* 446 U.S. 544, where the defendant consented to a search of her person by Drug Enforcement Agency agents at the Detroit airport after she disembarked from a flight from Los Angeles. *Id.* at 547–49. In addressing whether her consent was voluntary, the Court stated:

> [I]t is argued that the incident would reasonably have appeared coercive to the respondent, who was 22 years old and had not been graduated from high school. It is additionally suggested that the respondent, a female and a Negro, may have felt unusually threatened by the officers, who were white males. *While these factors were not irrelevant,* see *Schneckloth v. Bustamonte,* [412 U.S. 218, 226 (1973)], *neither were they decisive,* and the totality of the evidence in this case was plainly adequate to support the District

> Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office.

*Id.* at 558 (emphasis added). The problem for Cyrus is that the italicized language he relies on addressed a consent search, not a seizure. We too consider the "personal characteristics of the [consenter], such as age, education, intelligence, sobriety, and experience with the law" when adjudicating whether consent to a search is voluntary. *Hauge*, 973 N.W.2d at 462 (alteration in original) (emphasis omitted) (quoting *State v. Lane*, 726 N.W.2d 371, 378 (Iowa 2007)).[5] Consent turns on the subjective state of mind of the consenter. But Cyrus's consent is not at issue. Officer Morgan did not ask for Cyrus's consent to search him or his car, nor did Cyrus offer his permission. Neither our court nor the United States Supreme Court considers the age or race of the suspect in determining whether the officer's conduct constituted a *seizure.*

It makes sense to have a different test for seizure and consent. A seizure often occurs before any face-to-face communication between the officer and the driver, such as when a driver is pulled over after emergency lights are displayed. The court determines whether a seizure occurred based on the *officer's* conduct. *Fogg*, 936 N.W.2d at 668 (requiring "objective indices of police coercion"). By contrast, with consent, the officer and driver have engaged in face-to-face communication, and the court determines whether the *driver's* consent was voluntary based on the totality of the circumstances, including the consenter's personal characteristics. *Hauge*, 973 N.W.2d at 462; *see also Schneckloth*, 412 U.S. at 227–29 (applying totality-of-the-circumstances test, including accounting for "the possibly vulnerable subjective state of the person who consents").

---

[5]Our cases have not listed race or gender among the "personal characteristics" of the consenter. *See Hauge*, 973 N.W.2d at 462. The lone dissenter in *Hauge* argued that race and culture should be considered when evaluating consent. *See id.* at 491–92 (Appel, J., dissenting).

Cyrus also relies on dissents in our cases addressing pretextual stop claims. *Brown*, 930 N.W.2d at 863–71 (Cady, C.J., dissenting) (critiquing the majority's holding rejecting the consideration of the officer's subjective motives in pretextual stops and discussing how these stops have "disproportionally affected African-Americans in our state and across the nation"); *State v. Harrison*, 846 N.W.2d 362, 374 (Iowa 2014) (Appel, J., dissenting) (discussing how pretextual stops may subject African-Americans and other minority groups to "stops for 'driving while black' "). But Officer Morgan did not stop Cyrus, who was already parked; and the officer approached the Impala without knowing the car was occupied, much less the driver's race. We have long adhered to an objective standard for traffic stops and have expressly declined to consider the driver's race when adjudicating the validity of an officer's actions. *Brown*, 930 N.W.2d at 854 (majority opinion). We decline Cyrus's invitation to adopt these dissenting views.

The great weight of authority in other jurisdictions rejects using the suspect's race as a relevant factor in a seizure analysis.[6] A noted commentator

---

[6]*Compare United States v. Knights*, 989 F.3d 1281, 1288 (11th Cir. 2021) (discussing in detail the problems that arise from using race as a factor in deciding whether a seizure occurred, holding that "the race of a suspect is never a factor in seizure analysis," and noting that "our sister circuits [have also never] considered race in the threshold seizure inquiry"), *United States v. Easley*, 911 F.3d 1074, 1081–82 (10th Cir. 2018) (finding that "[n]either this court nor the Supreme Court has ever considered race a relevant factor in the Fourth Amendment context" and stating that "a seizure analysis that differentiates on the basis of race raises serious equal protection concerns if it could result in different treatment for those who are otherwise similarly situated"), *Monroe v. City of Charlottesville*, 579 F.3d 380, 386–87 (4th Cir. 2009) (holding that the defendant's subjective beliefs were irrelevant because "[t]o agree that [the defendant's] subjective belief that he was not free to terminate the encounter was objectively reasonable because relations between police and minorities are poor would result in a rule that all encounters between police and minorities are seizures" and "[s]uch a rule should be rejected"), *United States v. Sanders*, 2021 WL 4876230, at *7 (W.D. Mo. Oct. 19, 2021) ("The race of a suspect is thus not a factor in seizure analysis."), *and In re J.M.*, 619 A.2d 497, 499, 501–02 (D.C. 1992) (en banc) (declining to consider the defendant's race as a factor), *with State v. Sum*, 511 P.3d 92, 103 (Wash. 2022) (en banc) (basing its decision to consider race and ethnicity as "relevant to the question of whether a person was seized" on the state's own concession, the state constitution, "recent developments in this court's historical treatment of the rights of BIPOC, and the current implications of [its] decision"), *and United States v. Washington*, 490 F.3d 765,

warns that using age or race would be "unmanageable" and would lead us "down the proverbial slippery slope, necessitating attention to other varieties of special vulnerability." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.4(a), at 586–87 (6th ed. 2020) (stating that a test that uses a "reasonable youth" test would "doubtless prompt imaginative defense counsel to seek recognition in other cases of 'reasonable woman,' *'reasonable black'* and similar variations" (emphasis added)).

We decline to alter our longstanding seizure test to consider the defendant's age or race, and we reiterate that the reasonable person test "is sound law, and it remains the law today." *Fogg*, 936 N.W.2d at 669. The district court and the court of appeals correctly declined to consider Cyrus's age or race in determining whether Officer Morgan's actions constituted a seizure.[7]

## IV. Disposition.

For the foregoing reasons, we affirm the decision of the court of appeals and the district court's suppression ruling and judgment of conviction.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

---

773 (9th Cir. 2007) (considering "the publicized shootings by white Portland police officers of African-Americans" as part of the determination, under the "totality of the circumstances," of whether a seizure occurred). *But c.f. United States v. Smith*, 794 F.3d 681, 688 (7th Cir. 2015) (holding that while race is " 'not irrelevant' to . . . whether a seizure occurred, it is not dispositive either"); *State v. Jones*, 235 A.3d 119, 126 (N.H. 2020) (deciding that "race is an appropriate circumstance to consider," although the court reached its conclusion "irrespective of the defendant's race"); *Commonwealth v. Evelyn*, 152 N.E.3d 108, 121 (Mass. 2020) (discussing other courts that have adopted or declined to adopt race as a factor and then declining to "decide here whether the race of a defendant properly informs the seizure inquiry"); *State v. Spears*, 839 S.E.2d 450, 461 (S.C. 2020) ("We need not consider whether Spears' race is a factor to be considered when resolving the issue of whether the encounter was consensual.").

[7]For the first time on appeal, Cyrus argues for a strict scrutiny test in lieu of our existing reasonable person test. No other court has adopted a strict scrutiny seizure analysis. His argument is unpreserved, and we decline to reach it. *See In re V.H.*, ___ N.W.2d ___, ___, 2023 WL 6761321, at *4–5 (Iowa Oct. 13, 2023).