Filed 3/7/24 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEREMIAH PAUL,<br><br>    Defendant and Appellant. | B320488<br><br>(Los Angeles County<br>Super. Ct. No. BA485897)<br><br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on February 14, 2024, is modified as follows:

On the caption page listing Howard R. Price as counsel for Defendant and Appellant delete, "under appointment by the Court of Appeal,".

On page 9, in the first full paragraph, second sentence, replace "an objective person to believe that he or she was suspected of wrongdoing," with "a reasonable person to believe he is not free to leave or otherwise disregard the police and go about his business,".

The petition for rehearing filed on February 28, 2024, by plaintiff and respondent is denied.

There is no change in judgment.

_____

BAKER, Acting, P. J.   MOOR, J.   LEE, J.[*]

_____

[*] Judge of the Superior Court of San Bernardino County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JEREMIAH PAUL,<br><br>　　　Defendant and Appellant. | B320488<br><br>(Los Angeles County<br>Super. Ct. No. BA485897) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Richard S. Kemalyan, Judge.  Reversed and remanded, with directions.

　　　Howard R. Price, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Following the trial court's denial of his motion to suppress evidence of a firearm pursuant to Penal Code section 1538.5, Jeremiah Paul pleaded no contest to possession of a firearm with a prior violent conviction (Pen. Code, § 29900, subd. (a)(1)). Paul argues that the trial court should have excluded evidence of the firearm because officers discovered it only after they obtained his parole status by unlawfully detaining him.

We reverse the trial court's judgment, vacate the court's order denying Paul's motion to suppress evidence, and remand.

## FACTS

### *Officer Kumlander's Testimony and Evidence Obtained through a Body-Worn Camera*

At a hearing on the motion to suppress evidence, Los Angeles Police Department Officer Charles Kumlander testified that on March 7, 2020, at around 9:00 p.m., he and his partner Officer Helmkamp were patrolling a residential neighborhood. A Toyota Prius drew his attention because it was parked with the lights on and appeared to be occupied. Officer Kumlander drove the patrol car alongside the Prius and stopped. Officer Helmkamp, who was in the passenger seat, then illuminated the Prius with his flashlight. There was a male in the vehicle (later identified as Paul) who moved lower in his seat when the officer shined the flashlight. Officer Kumlander observed that Paul appeared to be "conceal[ing] himself from [the officers'] view." The officer also observed that Paul was male and had dreadlocks. Officer Kumlander patrolled the area regularly and knew that a parolee lived across the street from where the Prius was parked.

Officer Kumlander backed up the patrol car and parked it in the middle of the street with the headlights on. He then approached the driver's side door of the Prius to engage Paul in conversation. Officer Kumlander illuminated the driver's side with his flashlight. Officer Helmkamp simultaneously approached the Prius on the passenger side and illuminated that side of the vehicle with his flashlight. The Prius's driver's side window was rolled up, but the door was partially open. Officer Kumlander, who was standing two to three feet from the door, opened it further and spoke with Paul.

"KUMLANDER: How ya doin,' Man?

"DEFENDANT: What's up?

"KUMLANDER: How ya doin'?

"DEFENDANT: I'm alright, and you?

"KUMLANDER: Good.

"DEFENDANT: I'm alright.

"KUMLANDER: Alright, no, I'm just sayin' you live right here?

"DEFENDANT: Yeah.

"KUMLANDER: Where at?

"DEFENDANT: Right here.

"KUMLANDER: That one?

"DEFENDANT: Yeah.

"KUMLANDER: Okay.

"DEFENDANT: I think so.[1]

"KUMLANDER: Any probation or parole?

"DEFENDANT: Yes, sir.

---

[1] Although the transcript indicates that Paul responded, "I think so," upon review of the video it appears that Paul responded, "Okay, sir."

"KUMLANDER:  What? What's that?

"DEFENDANT:  Parole."

Officer Kumlander confirmed Paul's active parole status and then conducted a search of the Prius.  The officers discovered and seized a firearm located inside the Prius.

Officer Kumlander testified that he parked the patrol car in a way that permitted Paul to drive the Prius away.  There was a driveway behind the Prius and the patrol car was parked a full length behind it.  The headlights of the patrol car illuminated the road directly in front of the patrol car, and were not aimed at the Prius.  Officer Kumlander testified that he routinely asks people he contacts whether they are on parole or probation.

### Paul's Testimony

Paul testified that he parked his Prius about a minute before the officers approached him.  Paul had turned off the Prius's engine, but the lights remain illuminated for a few minutes after the engine is turned off, so the lights were still on.  He was on the phone with a family member who had just called.  The officers pulled up beside the Prius in their patrol car.  Paul did not slump down.  He did not recall shielding his eyes, but he testified that he may have done so in response to the officers shining a flashlight on him.  Paul did not open the door of the Prius.  The officers approached on both sides of the car, so he did not want to make any sudden moves.  If he had opened the door it would have hit one of the officers, who was standing right next to the Prius.  The Prius's driver's side window was rolled up and the officer was very close—"like inches away"—when he began to address Paul through the closed window.  It seemed to Paul that

4

there was a problem, so he raised his hands to shoulder level. Paul testified, "I don't want any problems. I don't want to, like, you know . . . get shot or nothing . . . . [I]t's nighttime. There are two officers on the side of the car. You know, they just got out the car for really no reason. So I'm just going to, you know, show I'm not trying to have problems. I'm going to raise my hands up." Paul testified that he was on active parole at the time of the stop. Paul understood that if he was asked about his parole status he had to answer truthfully, and he did.

### *Trial Court's Ruling*

Following the suppression hearing, the trial court issued a detailed written ruling denying Paul's motion to suppress. At the outset, the court acknowledged that "the legal analysis and ultimate resolution of the motion . . . present a very close issue." The court found that the following facts suggested the encounter was consensual up until the point where Paul disclosed his parole status: (1) the patrol car was not blocking the Prius and nothing prevented Paul from backing up and departing; (2) the officer's flashlights provided the only illumination of the Prius; the police did not use spotlights or headlights; (3) the officers did not approach the Prius at a brisk pace; (4) the officers did not touch Paul before he stated that he was on parole; (5) two officers were present; and (6) Officer Kumlander's tone when addressing Paul was casual and conversational before Paul stated he was on parole. The court found the evidence regarding who initially opened the door of the Prius inconclusive. The court found that if the officer opened the door it would be a show of authority, but if Paul opened the door it would indicate that he consented to the

encounter.  Either way, the court concluded that the issue of the door would be only one factor among many to consider.  The court determined that Officer Kumlander's inquiry regarding Paul's parole status did not, in itself, rise to the level of a detention.  Considering the circumstances in their totality, the court found that the initial encounter was consensual.

## DISCUSSION

" 'The Fourth Amendment protects against unreasonable searches and seizures.' " (*People v. Greenwood* (2010) 189 Cal.App.4th 742, 746.)  "A search conducted without a warrant is unreasonable per se under the Fourth Amendment unless it falls within one of the 'specifically established and well-delineated exceptions.' " (*People v. Woods* (1999) 21 Cal.4th 668, 674.)  "An illegal detention that uncovers evidence is generally subject to the exclusionary rule, which dictates the unlawfully obtained evidence be suppressed as ' "fruit of the poisonous tree." ' " (*People v. Kasrawi* (2021) 65 Cal.App.5th 751, 761.)

"It is 'well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.' " (*People v. Woods, supra*, 21 Cal.4th at p. 674.)  " '[C]onsensual encounters' [citation], . . . are those police-individual interactions which result in no restraint of an individual's liberty whatsoever—i.e., no 'seizure,' however minimal—and which may properly be initiated by police officers even if they lack any 'objective justification.' " (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.)  The Supreme Court has held "that the Fourth Amendment permits police officers to approach individuals at

6

random in airport lobbies and other public places to ask them questions . . . so long as a reasonable person would understand that he or she could refuse to cooperate." (*Florida v. Bostick* (1991) 501 U.S. 429, 431.) "The citizen participant in a consensual encounter may leave, refuse to answer questions or decline to act in the manner requested by the authorities." (*People v. Franklin* (1987) 192 Cal.App.3d 935, 941.) " 'Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur. [Citations.] "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation.' " (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1106; see *People v. Tacardon* (2022) 14 Cal.5th 235, 247 [declining to state a bright-line rule as to whether police use of a spotlight on a driver effects a detention, and reiterating that manner of use is one relevant consideration in evaluating the totality of the circumstances].)

"The test for the existence of a show of authority is an objective one and does not take into account the perceptions of the particular person involved. [Citation.] The test is 'not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.' " (*People v. Garry, supra*, 156 Cal.App.4th at p. 1106.) "This

includes an examination of both an officer's verbal *and* nonverbal actions in order to 'assess[ ] the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation.' " (*Id*. at p. 1110.)

" 'In ruling on a motion to suppress, the trial court finds the historical facts, then determines whether the applicable rule of law has been violated. "We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." ' " (*People v. Greenwood*, *supra*, 189 Cal.App.4th at pp. 745–746.)

Paul concedes that, after he informed the officers of his active parole status, their search of his vehicle and seizure of the firearm was lawful. He argues only that the initial encounter with the officers leading up to that lawful search was an unlawful detention. Paul asserts that, because the officers would not have obtained his parole status if they had not first detained him unlawfully, evidence of the firearm was not lawfully obtained and should be suppressed. The People respond that the encounter was consensual, and therefore exempt from the warrant and probable cause requirements.

Considering the totality of the circumstances, we conclude that the initial encounter with the officers was an unlawful detention and that the trial court's order must be reversed.[2] Several factors lead us to this conclusion. First, although Officer

---

[2] Neither party argues that the trial court's factual findings were not supported by substantial evidence. Our review focuses on the mixed question of whether the trial court's factual findings support its legal conclusions.

8

Kumlander did not park the patrol car in a manner that prevented Paul from driving away, the officers' subsequent positioning of their bodies blocked Paul from either driving away or departing on foot. By Officer Kumlander's own testimony, he was at most between two to three feet away from the Prius's driver's side door. Paul testified that the officer was inches away and that he could not open the door without hitting the officer. The video shows that, even if Officer Kumlander was standing a few feet away from the Prius initially, he was holding his flashlight only inches away from the driver's side window and had to move back to permit the door to open even slightly. Paul could not have exited the vehicle with Officer Kumlander standing there, nor could Paul have pulled the Prius out and driven away without either engaging or endangering Officer Kumlander. An objective person would not believe that he or she was free to simply start driving away with Officer Kumlander standing in the roadway. Moreover, the presence of Officer Helmkamp on the passenger side of the vehicle prevented Paul from sliding across the seat and exiting on foot without engaging Officer Helmkamp.

Second, Officer Kumlander and Officer Helmkamp exited their vehicle, approached the Prius from both sides, and shined their flashlights into the Prius from close range, right at the car door windows. This was a display of authority that would lead an objective person to believe that he or she was suspected of wrongdoing, both because more than one officer approached and because the officers shined their flashlights on Paul from opposite angles, effectively illuminating him on all sides. (See, e.g., *People v. Tacardon, supra,* 14 Cal.5th at p. 247 ["the facts of a particular case may show a spotlight was used in an authoritative

manner"]; *In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 760 [holding that multiple officers approaching a vehicle and standing in front of the doors is a show of authority]; *People v. Kasrawi, supra*, 65 Cal.App.5th at p. 757 [holding that an "officer's use of a sustained spotlight on an individual at night . . . [is a show of authority that] undoubtedly signals on the otherwise empty street that the individual is 'the focus of the officer's particularized suspicion' "].) If the officers wished to signal that Paul was free to go, the officers could have approached the Prius from the same side of the vehicle and engaged Paul in casual conversation. The officers instead flanked the Prius and approached from both sides while shining their flashlights into the vehicle. The officers' approach is exactly the kind of coordinated action that an objective person would expect to witness when being detained. A reasonable person would conclude that when two officers approach in this manner, surrounding the individual in the vehicle, he or she is not free to leave.

Third, the officers approached Paul while he was talking on his phone inside a legally parked vehicle with the windows rolled up. Paul could not reasonably decline to interact with the officers without suspending or ending his phone conversation and at least engaging in a brief conversation with them. The circumstances would lead an objectively reasonable person believe that the officers required their attention and that they could not simply depart.

Substantial evidence supports the trial court's conclusion that no definitive finding can be made on this record regarding whether Paul or the officer initially opened the door to Paul's car. However, in our view it does not matter who opened the door. In

light of the manner in which the officers approached the Prius, an objectively reasonable person would not feel free to leave. If Paul opened the door, the reasonable explanation for doing so would be to display compliance with the officers' show of authority rather than to risk being viewed as resisting a detention. If instead Officer Kumlander opened the door, an objective person would understand that opening the door was another expression of authority by the officer and yet further reason to believe that departing the scene without engaging the officers was not an option.

Finally, although the dialogue between Paul and Officer Kumlander appears to have been non-confrontational in tone and language up to the point when Paul stated that he was a parolee, this is not strong evidence to conclude that a reasonable person would have felt at liberty to terminate the encounter with the officer. A detention may occur even where "the officers seemed calm, courteous, and used a conversational tone." (*In re Edgerrin J.*, *supra*, 57 Cal.App.5th at p. 760.) Ostensibly, Officer Kumlander would interact in a polite, professional manner with a detainee who was responding in a polite manner, as Paul was in this case. If the officer's tone and words had been aggressive, it would be an additional reason for a reasonable person to believe that he or she was being detained. The converse is not necessarily true, however—the officer's courteous manner of speaking did not overcome the impression that he intended to detain Paul, which he and his partner conveyed through their actions. Moreover, if Officer Kumlander did not intend to detain Paul, he could have stated that Paul was free to leave at the outset of the conversation.

11

In light of all of the circumstances, we cannot conclude that the interaction between Paul and the officers was consensual. The trial court erred by denying Paul's motion to suppress. "Because it is impossible to assess the impact of an erroneous denial of a motion to suppress evidence on a defendant's decision to plead [no contest], the harmless error rule is inapplicable in appeals taken pursuant to Penal Code section 1538.5, subdivision (m). (*People v. Miller* (1983) 33 Cal.3d 545, 556; *People v. Hill* (1974) 12 Cal.3d 731, 767–769, overruled on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5.) Accordingly, the judgment must be reversed." (*People v. Suggs* (2023) 93 Cal.App.5th 1360, 1366.)

## DISPOSITION

The judgment is reversed, the conviction is vacated, and the matter is remanded.  On remand, the trial court shall vacate its order denying Paul's motion to suppress the evidence and shall enter a new order granting that motion.

CERTIFIED FOR PUBLICATION

MOOR, J.

We concur:

BAKER, Acting, P. J.

LEE, J.[*]

---

[*] Judge of the Superior Court of San Bernardino County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.