Filed 5/31/24  P. v. Mays CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PHINA MAYS,<br><br>    Defendant and Appellant. | B332772<br><br>(Los Angeles County<br> Super. Ct. No. BA507883) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Terry A. Bork, Judge.  Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Phina Mays pled no contest to one misdemeanor count of having a concealed firearm in a vehicle and was placed on probation. Defendant's sole contention on appeal is that the trial court erred in denying her motion to suppress pursuant to Penal Code section 1538.5.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Officer Eric Hernandez of the Los Angeles Police Department testified to the following facts regarding defendant's detention and the recovery of the firearm from the car in which she was a passenger. Officer Hernandez was the only witness at the hearing on defendant's motion to suppress. Several minutes of his body camera footage was admitted into evidence.

On August 19, 2021, around 10:30 p.m., Officer Hernandez was working a gang enforcement detail with his partner in a marked patrol car. They were "conducting extra patrol" in the area of Hyde Park and West Boulevard "due to a high increase in shootings, narcotics-related offenses" and "specifically sales" at that particular intersection. That area and the general vicinity were known territory of the Rolling 60's gang—a stronghold where gang members were known to congregate.

As they approached the intersection, Officer Hernandez noticed two men standing in the parking lot of the convenience store located on the corner, one of whom was wearing a black T-shirt and the other a blue shirt and a hat. The men appeared to be "loitering" and were approximately three to five feet from a Toyota Corolla that had been reversed into a parking space with the headlights still on.

Officer Hernandez pulled the patrol car into the center of the parking lot and parked. The body camera footage shows the patrol

car in the center of the lot, with no lights on other than the headlights. It does not appear to be blocking the Toyota in any way.

The man in the black T-shirt looked startled and nervous when he saw the patrol car. It was later determined he was the driver of the Toyota. Officer Hernandez testified the man opened his eyes wide and "immediately walked" away from them and into the store, while continuing to "look back" at the patrol car. The man in the blue shirt and hat stayed where he was, standing between the Toyota and a Chevrolet Impala.

Officer Hernandez and his partner got out of their patrol car to check whether any items had been discarded by the man in the black T-shirt before he walked into the store. When asked to clarify, Officer Hernandez said it was typical that when they approached individuals they suspected of criminal activity, the individuals would drop narcotics or other contraband.

The body camera footage shows Officer Hernandez approach the Toyota while his partner walked around the Impala with a flashlight.

When Officer Hernandez walked up to the driver's side of the Toyota, he saw defendant, seated in the front passenger seat, for the first time. Officer Hernandez shined his flashlight into the floorboard area of the driver's seat. He then walked around the back of the car to the passenger side. The body camera footage supports Officer Hernandez's testimony.

Officer Hernandez testified that upon flashing his light into the floorboard area where defendant was seated, he immediately saw the barrel of a handgun "protruding" from under her seat. He said the barrel was in plain view. He explained that the gun was not visible on the body camera footage because of the angle at which the body camera was attached to him and also because defendant's legs partially concealed it.

3

Upon seeing the gun, Officer Hernandez used a code word ("Pete") to let his partner know he had seen a weapon. The body camera footage was silent up to that point but it included audio thereafter. Officer Hernandez explained that the body camera does not record audio until an officer personally turns the camera on. There is always about two minutes of silent "buffer" footage that precedes the audio portion.

When the audio begins, Officer Hernandez can be heard saying "hey Pete" to his partner (still standing by the Impala) and asking him to run a check on the man or something to that effect. Officer Hernandez then asked defendant to step out of the car. Defendant unfastened her seat belt, appeared to lean over and turn off the keys in the ignition, and then got out of the car without incident. Officer Hernandez asked defendant to step over to the wall of the store and placed her in handcuffs. Defendant cooperated. The body camera footage shows Officer Hernandez's partner simultaneously placing handcuffs on the man in the black T-shirt who had come out of the store at that point. Officer Hernandez then secured the handgun.

On cross-examination, Officer Hernandez confirmed they had not received any call or report of criminal activity and were just patrolling the area. He said he did not see a firearm as he approached the Toyota and did not see behavior consistent with a "hand-to-hand exchange" for a narcotics sale. He said reasonable suspicion was raised by the manner in which the man in the black T-shirt sought to avoid them, saying he acted in a manner "not common for most civilians." The man in the blue shirt and hat was not detained because he did not give them a startled look, act in a furtive manner or seek to avoid them like the man in the black T-shirt.

After entertaining argument from counsel, the court denied defendant's motion. The court found credible Officer Hernandez's testimony that he saw, in plain view, the barrel of the handgun protruding from under defendant's seat when he looked into the car with his flashlight. The court found that defendant was not detained until Officer Hernandez asked her to step out of the car and placed her in handcuffs in front of the store.

Defendant pled no contest to one misdemeanor count of having a concealed firearm in a vehicle. (Pen. Code, § 25400, subd. (a)(1).) Defendant was sentenced to three days in jail (with credit for time served) and one year of summary probation.

This appeal followed. We granted defendant's request to submit supplemental briefing on the Supreme Court's decision in *People v. Flores* (May 2, 2024, S267522) ___ Cal.5th ___ [2024 Cal. Lexis 2293] (*Flores*) which was issued after briefing in this matter was complete. Both parties filed supplemental letter briefs.

## DISCUSSION

Our standard for reviewing the trial court's ruling on the motion to suppress is well established. " 'We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.) "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court." (*People v. Tully* (2012) 54 Cal.4th 952, 979.) And, as the Supreme Court recently reaffirmed, in undertaking this review, we do not review each fact related to the search or seizure in isolation, but rather, " 'we must

consider "the totality of the circumstances—the whole picture." ' " (*Flores*, *supra*, ___ Cal.5th ___ [2024 Cal. Lexis 2293 at p. *11].)

Defendant contends her detention was unconstitutional because she was detained the moment the officers parked and exited their patrol car, without any lawful basis. She argues that no minority would have felt free to leave from that point on.

The record belies defendant's argument. The testimony of Officer Hernandez, corroborated by his body camera footage, established that he parked the patrol car in the center of the parking lot with no lights flashing and no use of a siren. He did not maneuver the car towards or otherwise block the Toyota in which defendant was seated. Upon getting out of their car, the officers did not display weapons, did not issue commands, and did not act in an aggressive manner. Officer Hernandez and his partner merely walked toward the parked cars and began using their flashlights to investigate whether there was any discarded contraband.

It is settled that an officer may approach and interact with an individual in a public place and ask if they are willing to answer questions. (*People v. Tacardon* (2022) 14 Cal.5th 235, 241 (*Tacardon*); *Florida v. Bostick* (1991) 501 U.S. 429, 434; *People v. Brown* (2015) 61 Cal.4th 968, 974.) " 'Such consensual encounters present no constitutional concerns and do not require justification.' " (*Tacardon,* at p. 241.) A consensual encounter becomes a seizure or detention that must be justified under the Fourth Amendment only when the officer " ' "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." ' " (*Ibid.*; *Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16.)

*Flores* framed it this way. "To be clear, officers may observe what people do in public places. They may consider what they see in plain view and determine whether what they observe merits further observation, inquiry, or intervention. They may approach

people in public, engage them in consensual conversation, and take note of their appearance and behavior. Nervous behavior and attempts to conceal oneself may provide relevant context. But before officers may *detain* someone they must be able to articulate a legally cognizable reason to infringe on that person's liberty." (*Flores*, *supra*, ___ Cal.5th ___ [2024 Cal. Lexis 2293 at p. *28].)

Factors that may be relevant in determining when a consensual encounter becomes a seizure for Fourth Amendment purposes include "the presence of multiple officers, an officer's display of a weapon, the use of siren or overhead emergency lights, physically touching the person, the use of a patrol car to block movement, or the use of language or of a tone of voice indicating that compliance with the officer's request is compelled." (*Tacardon*, *supra*, 14 Cal.5th at pp. 241-242.) Unlike this case, in *Flores* there was no dispute the defendant was detained before any incriminating evidence was observed.

Defendant urges us not to "apply only an 'objective' standard" that ignores race as a factor. Defendant says the Supreme Court in *Flores* reaffirmed that the establishment of reasonable suspicion is always "contextual," and cites recent cases for the proposition that "a community's or group's experience with law enforcement is a significant factor of which officers must be mindful and courts should consider in evaluating the objective reasonableness of any asserted suspicion of criminality." (*Flores*, *supra,* ___ Cal.5th ___ [2024 Cal. Lexis 2293 at p. *24].)

But *Flores* did not adopt a new subjective standard. *Flores* reaffirmed the importance of the objective standard in assessing the totality of circumstances, calling it "the touchstone of Fourth Amendment scrutiny" and underscoring that "*it is imperative that the circumstances confronting both the officer and the citizen be judged against an objective standard.*" (*Flores, supra,* ___ Cal.5th

___ [2024 Cal. Lexis 2293 at p. *24], italics added.) Even the concurrence in *Flores* did not propose the adoption of a new subjective test. Rather, the concurrence acknowledged that the test remains an objective one and that "future litigants" may be able to formulate "arguments about how racial disparities in policing might inform one's decision to avoid contact with the police." (*Id.* at p. *36 (conc. opn. of Evans, J.).)

Citing her status as a middle-aged black woman, defendant wants us to find that she was detained the moment the police "pull[ed] up in a manner as to convey to everyone present that they were not free to leave." We decline to adopt that broad a definition of detention for it is *entirely* based on what the "detainee" subjectively "felt" without regard to the totality of the circumstances. Here, the totality of the circumstances included the fact that the police parked their car in the parking lot of a convenience store without blocking the car in which defendant was seated and without telling her or anyone else in any way that they were not free to leave. Defendant's alleged subjective belief as a black woman that the "manner" in which the police car pulled up and parked communicated to her that she was being detained is insufficient under these facts to create a detention under the Fourth Amendment. This contention goes too far under these facts.

Unlike *Flores*, this case has nothing to do with defendant's right to decline interaction with the officers or the officers' authority to compel her to interact with them before Officer Hernandez saw the gun barrel. The record demonstrates that defendant was not detained within the meaning of the Fourth Amendment until Officer Hernandez saw, in plain view, the barrel of a handgun protruding from under her seat and asked her to step out of the car. Defendant does not suggest that a police officer observing a partially concealed firearm lacks a reasonable basis to effectuate a

detention to facilitate further investigation, and we would reject such an argument if it were made.  The motion to suppress was properly denied.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.

WE CONCUR:


STRATTON, P. J.


VIRAMONTES, J.